[No. 298-41514-2.   Division Two.   June 24, 1971.]

MAXWELL W. WILSON *et al., Respondents,* v. WILLIAM HOWARD *et al., Appellants.*

*Betty Taylor Howard,* for appellants.

*Charles B. Welsh,* for respondents.

PETRIE, C.J.—Maxwell W. Wilson and Marie I. Wilson, his wife, commenced this action to quiet title to a parcel[1] of land designated as tax No. 131 in Pacific County lying adjacent to, and westerly of, lots 3 and 4 of block 14 of Plat of Pioneer. William S. Howard, Jr., and Betty Taylor Howard, his wife, are the owners of said lots 3 and 4, deriving their title through mesne conveyances from the original plattor, who was the original patentee from the federal government prior to statehood. Howards have cross claimed to quiet title to any land lying westerly of their two lots.

It is clear from the record that these two lots originally were beachfront lots facing the Pacific Ocean, but in recent years considerable accretion has taken place to the extent that the Pacific Ocean now lies almost a quarter mile west of the original beach.

---

[1]Also involved at the trial, but not in this appeal, are two other parcels, designated tax Nos. 115 and 132.

Wilson's claim of ownership is founded upon his compliance with the provisions RCW 7.28.080, the so-called "vacant land" statute, which provides in part:

Every person having color of title made in good faith to vacant and unoccupied land, who shall pay all taxes legally assessed thereon for seven successive years, he or she shall be deemed and adjudged to be the legal owner of said vacant and unoccupied land to the extent and according to the purport of his or her paper title.

Howards' claim to the contested land is founded upon (1) the original conveyance to their predecessors in title with intent of the plattor to convey full ownership of the land to the high watermark of the Pacific Ocean and (2) adverse possession of the disputed land by successive owners from 1891 to date.

The trial court accepted the Wilsons' claim, entered a decree quieting fee simple title in them to tax No. 131, and further decreed that Howards had no right, title, claim or interest in said property. Howards have appealed, assigning error to entry of the decree and to six separate findings of fact entered by the court.

We consider, first, Wilsons' claim—in particular, the applicability of RCW 7.28.080. Two challenged findings bear directly upon this issue:

9

That these lands in question at all times herein mentioned have been and now are vacant and unoccupied in fact.

10

That the lands in question are alike in character and use to all of the lands in this area, in being open and wild, and any use made by defendants Howard to this land was only incidental and occasional, and there is no evidence of any affirmative act on the part of defendants Howard, or their predecessors in interest, to exclude anyone else, including members of the public, from such little or seldom use of these sand dunes. That such casual or incidental uses as were made by the defendants Howard, or their predecessors, was not open, hostile or uninterrupted with claim of ownership against the rest of the world.

■ We are struck immediately with what appears to be a contradiction between findings 9 and 10. The lands are found to be vacant and unoccupied, yet some use of the land—so far as it relates to tax No. 131—has been made by defendants, Howard. It is clear that possession and use of the land, sufficient to defeat the application of the "vacant land" statute, need not be so extensive as to support a claim for adverse possession. *Lohse v. Burch,* 42 Wash. 156, 84 P. 722 (1906). Further, any use of the questioned land, however temporary, consistent with its general nature, would appear to be sufficient to preclude application of the statute. In *McCoy v. Lowrie,* 42 Wn.2d 24, 253 P.2d 415 (1953), temporary use of timber lands by "cedar makers", employed by the party claiming title and working but not living on the land, was deemed to be sufficient to categorize the land as neither vacant nor unoccupied.

In the case at bar, the use of the land by the Howards, while properly categorized as occasional, was nevertheless, consistent with the nature of the land itself. The use of the land westerly of Pioneer Plat is probably best indicated by Mrs. Elizabeth Price Morgan, whose family has used the land since 1923. It is still used as a family recreational area, she declared, the difference in recent years being simply that the extensive accretions have caused the families to traverse greater distances to reach the ocean. Somewhat indicative of the recent character of the land west of lots 3 and 4, and the Howards' assertion to ownership of the questioned property (as well as the plaintiffs' knowledge thereof) is plaintiff, Max Wilson's own testimony under cross-examination by Mrs. Howard:

Q  Isn't it true the water stands out there in the dunes every winter from late October until late March or April?
A  In just some of the very low spots. That varies a little bit with the different areas.
Q  Some of them are as much as 25 or 30 feet across aren't they on some of those little lakes out there?
A  Here's the idea. It depends on how you measure it. There is a little slough there that winds for 20 or 30 feet

and you got 25 or 30 feet crosswise versus four or five feet wide. I'm speaking of the area in front of the Howard's place.

Q If you don't mind, would you explain about this house of yours and mine you were going to build.

A I was out there working on that frontage one day and Mrs. Howard asked me what I was going to do with it. I told her I was going to build a house. She said, "I'd like to see your plan." I said, "What difference does that make?" She said, "I'd like to see it if I'm going to live in it."

In view of the nature of the land, only a slight use thereof, consistent with its obvious nature as wild and ill-formed accretions in front of existing beach front property, is, and in fact was, sufficient as a matter of law to take it out of the categorization of "vacant and unoccupied." The learned trial judge clearly understood the changing characteristics of the topography, having been an avid observer of the land as man and boy. In our opinion, however, the trial court applied too stringent a test to determine whether or not the land was vacant and unoccupied under the statute. This is exemplified by that portion of the trial court's oral opinion as follows:

I am sorry that they didn't have the foresight that sometime during the 7 years to convert this land from vacant and unoccupied land to something else. I wished they have gone out there and run a fence out there and run a fence a couple hundred feet and gone at least to the line —the meander line of 1858 and closed off that and put up signs, "Private Property" or "Keep Off." As I read the statute, I think the land had to remain vacant and unoccupied for the entire period of 7 years along with the payment of taxes under color of title for that period of time. I am terribly sorry that they didn't exercise something or take some action to stop this.

It was not necessary for the Howards to have used the property in such a manner as to either establish a claim of adverse possession or to defeat a claim for adverse *possession* asserted by another. The only use necessary was a use of the property sufficient to defeat the Wilsons' recourse to

the "vacant and unoccupied" statute. It is axiomatic that a given parcel of land cannot at one and the same time be both (1) "used" under claim of right, even occasionally, consistent with its very nature, and also (2) "vacant and unoccupied."

We conclude, therefore, that during a portion of the time Mr. and Mrs. Wilson paid taxes on the property, it was not "vacant and unoccupied." The decree, insofar as it quiets title to that portion of tax No. 131 lying westerly of lots 3 and 4, block 14, Plat of Pioneer, in plaintiffs, must be vacated.

We turn next to Howards' cross complaint seeking to have the title in the disputed land quieted in them. Such an action must stand upon its own strength and not upon the weakness of the claim of the adversary. *Turner v. Rowland,* 2 Wn. App. 566, 468 P.2d 702 (1970).

In order to evaluate Howards' claim, a brief history of ownership of the land seems necessary. In 1865, John Briscoe received, as patentee from the United States Government, an elongated trapezoidal strip of land approximately 2½ miles from north to south whose southern base was 17 chains (1,122 feet) and whose northern base was 14 chains and 48 links (approximately 956 feet). Although the patent does not so indicate, the westerly edge of the strip of land apparently was waterfront property along the Pacific Ocean; certainly John Briscoe's subsequent actions indicate there was no other upland between the westerly boundary of his land and the Pacific Ocean. The northern half of this strip was awarded to his wife, Lucy, and the southern half was awarded to John.

In December, 1890, slightly more than a year after statehood, he dedicated a rectangular plat into a townsite under the name of Pioneer, Pacific County. This plat corresponds roughly with the northern ⅔ of the south half of the original patent, except that for some reason, unaccounted for in the record, both the north and south bases of the plat are 1,305 feet in width, several hundred feet wider than the original patent. The plat originally contained 96 blocks,

each block being separated by a street or avenue and each block (except several fractional blocks) being subdivided into 8 lots. Blocks 1 through 16 lie in a tier on the westerly edge of the plat. Immediately west of these latter 16 blocks is an area designated "Beach", and west thereof is a series of wavy lines followed by the words "Pacific Ocean." The area designated "Beach" is clearly outside the descriptive limits of the plat. Lots 3 and 4 of block 14 lie immediately adjacent to and east of the area designated "Beach."

On December 3, 1891, John Briscoe conveyed lots 3 and 4 of block 14, "together with all and singular the tenements, hereditaments and appurtenances thereto belonging or in any wise appertaining," to Annie M. Crowley. Through mesne conveyances, the Howards have now acquired record title to the same property. A recent survey, plaintiffs' exhibit 3, establishes that the 1858 original United States Government meander line lay some 230 feet west of lots 3 and 4. As did the trial court, we accept this survey as correctly reestablishing the 1858 meander line. There is nothing in the record to establish where the mean high tide line lay in 1890 relative to these same lots.

Plaintiffs, Wilsons, contend that the intent of the plattor was to reserve unto himself the "land" lying in the area designated "Beach." Defendants, Howards, on the other hand, contend that the intent of the plattor, as expressed on the face of the plat, was that the beachfront lots carried with them ownership to the line of the beach—the line of mean high tide.

The trial court's resolution of the issue is contained in finding of fact 6:

6

That based upon plaintiffs' exhibit 1, being the Plat of Pioneer, and plaintiffs' exhibit 3, being the engineer's map portraying a recent survey showing the location on the ground of the western boundary of the Plat of Pioneer and the re-established boundary of the original United States Government meander line of 1858, it is apparent that the original plattor retained lands lying westerly of the western boundary of this plat and the line of mean high tide of the Pacific Ocean; and the

176

intention of the dedicators, if extrinsic evidence is necessary, is further confirmed by plaintiffs' exhibit 7 in which John Briscoe deeded to his wife, Julia Briscoe, all lands lying between the western boundary of this plat and the Pacific Ocean; and that defendants' exhibit 8 is a conveyance from ,U. S. Briscoe and Julia Ethel Briscoe Dowling conveying a portion of these lands lying west of the west boundary of this plat to Portland Trust Company.

■ This finding is based solely upon the trial court's review and analysis of written instruments. We are free, therefore, to test its sufficiency by our own independent review and analysis of the same instruments. *Johnston v. Monahan*, 2 Wn. App. 452, 469 P.2d 930 (1970).

■ The primary document is, of course, the plat itself. In construing the plat, the intention of the dedicator controls. Such intention is to be ascertained from all the marks and lines appearing thereon, and, if possible, the interpretation which gives effect to all markings will be followed. *Frye v. King County*, 151 Wash. 179, 275 P. 547, 62 A.L.R. 476 (1929).

■ When a plat indicates on its face that lots within its boundaries extend to the shoreline as one of its boundaries, there is a clear intention of the dedicator to include within the plat all upland to the shoreline. *Frye v. King County, supra.*

Nor do we find any contrary intention from the extrinsic evidence specified by the trial court in finding of fact 6, above. On January 15, 1900, more than 9 years after having filed the plat, John Briscoe conveyed extensive tracts of land (including property in Pioneer Plat) to his then wife, for life, and to his children. No mention therein was made to any land west of Pioneer Plat. However, 10 days later he executed another deed, exhibit 7, to the same grantees, describing the property and property rights conveyed as follows:

[A]ll the riparian rights owned by me bordering or adjoining to the Pacific Ocean also all the land owned by me between the town of Pioneer and the Pacific Ocean.

The grantees, themselves, never understood that they re-

ceived, by this later deed, any land west of block 14, if indeed, west of the original plat, because in 1920, they conveyed and warranted title (exhibit 8) to land in Pacific County to the Portland Trust Company of Oregon, but incorporated within the same document by quitclaim only and specifically excluded from the warranty thereof:

[A]ll that portion or strip of ground lying between the west line of the plat of Pioneer, as formerly platted, and the meander line of the Pacific Ocean, and between the north line of Block 7[2], extended westerly and the north line of Block 1, extended westerly, Pioneer Plat, . . .

There is no indication from the record that John Briscoe's wife or children[3] ever asserted ownership over any land lying west of block 14. The deed executed by John Briscoe on January 15, 1900, indicates an intent to dispose of all his real property—at his then obviously advanced age —to his natural heirs. There is a curious, precautionary postscript added to that deed, signed by two persons declaring "I have witnessed the delivery of these deeds." The second deed, executed almost as an afterthought, is also precautionary on its face. It must be remembered that this latter deed (exhibit 7) was executed prior to enactment of RCW 79.16.170 and .171 (Laws of 1901, chapter 110, sections 1 and 2), which prohibited sale of tidelands in Pacific County. Accordingly, at the time it was executed, section 46, chapter 89, Laws of 1897, and sections 11 and 12 of the act of March 26, 1890, Laws of 1889-90, p. 435, had some potential vitality. *See Port of Seattle v. Oregon & W. R.R.,* 255 U.S. 56, 65 L. Ed. 500, 41 S. Ct. 237 (1920). Those sections provided that any attempted conveyance of tide or shorelands or littoral rights therein by the upland owner conveyed to the grantee such rights of purchase to said lands which the original owner of the uplands then had.

[2]Blocks 1 through 7 of Pioneer Plat lay northerly of block 14 and were included in the portion of the plat vacated in April, 1900, by order of the board of county commissioners.

[3]The heirs of John Briscoe and the heirs of his wife and children were joined as parties defendant herein, and default judgment has been entered against them.

Accordingly, in view of the time and circumstances under which John Briscoe executed exhibit 7, the deed of January 25, 1900, we do not consider it in any manner detracts from the intention expressed on the face of the plat.

Prior to resolving what John Briscoe's intention was in 1890, however, we must review one additional contention by the Wilsons. Their brief declares that they specifically rely upon the ruling of the court in *Spinning v. Pugh,* 65 Wash. 490, 118 P. 635 (1911). Indeed, there is a striking similarity between the facts in *Spinning* and the facts in the case at bar. However, there is also a striking, and to us, a critical, dissimilarity. In *Spinning,* the plat itself showed an unplatted area of *upland* between the Puyallup River and the front line of lots platted; the testimony showed that a considerable tract of land existed *at the date of the plat* between the lots platted and the high watermark of the river. Under such a state of facts, the court had no difficulty in determining that title to the unplatted upland together with the subsequent substantial accretions, remained in the original plattor.

In the case at bar, there is no indication on the plat that any upland existed between lots 3 and 4 and the "Beach." Although the recent reconstruction of the government surveyed meander line of 1858, which shows such line to have been approximately 230 feet west of the westerly line of lots 3 and 4, may be considered as evidence of where the actual mean high water line lay in 1858, *Ghione v. State*, 26 Wn.2d 635, 175 P.2d 955 (1946), it is certainly no indication to us where the mean high water line lay in *1890*—some 32 years later. Therefore, there is nothing whatsoever in the record to indicate the relationship of the western edge of the lots and the line of mean high water at or about the date of the plat.

We conclude, therefore, that in 1890 when John Briscoe filed his plat, he intended to grant to the subsequent purchasers of lots 3 and 4 precisely what the plat indicates— ownership up to the "Beach." Thus, in 1891, Annie Crowley acquired title to land up to the "Beach"; and subsequent

grantees through her also acquired ownership to the beach to the same extent that she possessed.

Our search, therefore, resolves into a determination of what the plattor meant when he incorporated the terms "Beach" and "Pacific Ocean" on the plat in the manner outlined above.

We have not been presented with any definitive meaning of the term "Beach" as interpreted in the state of Washington, statutorily or judicially, at or about the time of filing the plat in 1890. Our limited research has not been more successful. We do note, however, that in 1887, the Supreme Court of the State of Oregon, noting the absence of statutory guides, and citing California precedent, declared:

> In *People* v. *Davidson*, 30 Cal. 386, Shafter, J., said: "We find nothing in the Act of May 14, 1861, affording the slightest clue to the sense in which the legislature used the words 'tidelands' therein. . . . . Under such circumstances that definition must be adopted which on the whole is most reasonable; and that is supplied in our judgment by the words 'strand,' 'beach,' or 'shore,' in the common-law sense of the terms. Shore is defined to be land on the margin of the sea or a lake or river; that space of land which is alternately covered and left dry by the rising and falling of the tide; the space between high and low-water mark. It is synonymous with beach, which is the strip of land between high and low-water mark. 'By a beach,' said Weston, J., 'is to be understood the shore or strand. . . . . The word 'beach' must be deemed to be land washed by the sea and its waves, and to be synonymous with shore.' " (*Cutts* v. *Hussey*, 15 Me. 241.)

*Elliott* v. *Stewart*, 15 Ore. 259, 14 P. 417 (1887) at 261.

We note, also, that at least in New England, the term "beach" seems to possess a primary meaning—the area between ordinary high watermark and low watermark, over which the tide ebbs and flows—and a secondary or common parlance meaning—that strip of land above the usual high water line, more or less well defined by natural boundary, which the water reaches at extreme high tide or during storms. *Hewitt* v. *Perry*, 309 Mass. 100, 34 N.E.2d 489 (1941); *Dawson* v. *Orange*, 78 Conn. 96, 61 A. 101 (1905).

180

We are constrained to attach to the term "beach" its primary meaning as being synonymous with the term "shore." *See generally,* C. Corker, *Where Does the Beach Begin,* 42 Wash. L. Rev. 33 (1966-67). It is well understood, in this jurisdiction, that the term "shore" includes the strip of land lying between the lines of high and low watermark, and if there are no qualifying words to indicate whether the inner or outer line of the shore was intended, then the rule of construction favors only the inner line and the grant does not extend across the shore. *Maynard v. Puget Sound Nat'l Bank,* 24 Wash. 455, 64 P. 754 (1901).

We conclude, therefore, that in 1891, when Annie M. Crowley acquired title to lots 3 and 4 of block 14, Pioneer Plat, the western boundary of her land extended to the line of ordinary high watermark. That line is the line of mean high tide determined as nearly as possible by calculating the average height of all high tides at that location over the 18.6 year tidal cycle. *Borax Consol. v. Los Angeles,* 296 U.S. 10, 80 L. Ed. 9, 56 S. Ct. 23 (1935). The actual western boundary of her land and the land of her successors in interest is determined by the line formed by the intersection of the plane of that average height (Z-coordinate) and the ground, as said ground may shift from time to time. *Hughes v. Washington,* 389 U.S. 290, 19 L. Ed. 2d 530, 88 S. Ct. 438 (1967).

In view of the foregoing, the judgment appealed from, insofar as it quiets title in plaintiffs to that portion of tax No. 131 lying west of lots 3 and 4, block 14 of Pioneer Plat, is reversed, and this cause remanded with direction to quiet title therein, up to the line of mean high tide of the Pacific Ocean as now or hereafter may be located, to defendants, William S. Howard, Jr., and Betty Taylor Howard, husband and wife.

ARMSTRONG and PEARSON, JJ., concur.

Petition for rehearing denied August 3, 1971.

Review denied by Supreme Court October 5, 1971.