[No. 9537-4-I. Division One. February 7, 1983.]

KYUNG WHA LOBDELL, ET AL, *Appellants,* v. SUGAR 'N SPICE, INC., ET AL, *Respondents.*

*George, Hull & Porter, P.S.,* by *T. Dennis George* and *Karen L. Tall,* for appellants.

*Nelvin Bettis,* for respondents.

RINGOLD, J.—The plaintiffs, Kyung Wha Lobdell and Barbara J. Caires, brought this action against the now defunct Sugar 'N Spice, Inc., its president and then sole stockholder, Robert Christopher, and its agents, Joan Wilcox and Martin Bellman, alleging violations of both the Franchise Investment Protection Act (FIPA or Act), RCW 19.100, and the Consumer Protection Act (CPA), RCW 19.86. Finding no statutory violations, the trial court dismissed the action and awarded attorney's fees to the defendants. We reverse.

Sugar 'N Spice (the company) was a California corporation engaged in the business of selling candy distributorships. According to its introductory brochure, the company offered a "distributorship program" for the sale of quality "impulse" confections at retail locations where display racks could be placed. For a certain price, the distributor received a package consisting of candies, gumballs, sugar, jars, display racks and signs, labels printed with the logotype "Sugar 'N Spice," and packaging tools. The company would train new distributors in marketing the confections, in making "sugar art," in servicing their accounts, and in bookkeeping, and obtain for them several retail locations for the display racks.

The company literature further explains its marketing system. The brochure describes the company's "computerized system" for determining what kinds of confections sell best in what types of retail stores and geographical areas, and its success in obtaining for its distributors display rack locations throughout entire retail "chains." Under its "distributorship program," the brochure states, distributors are granted "exclusive locations" for the sale of an "instantly

recognized product" which is "in demand by the buying public" and yields a "very high margin of profit." Company newsletters describe its products as having been "pretested for sales appeal" and its goals as providing distributors with high quality products, attractive Sugar 'N Spice labels, signs, other marketing aids, and general business assistance.

Lobdell and Caires became acquainted with Sugar 'N Spice through their mutual friend, Bellman, who introduced them to Wilcox, a company distributor and distributor recruiter. After being told that Wilcox had grossed over $35,000 in 9 months as a distributor, Lobdell and Caires each purchased a 20–rack distributorship and paid $7,670.68 in cash. Lobdell was granted a distributorship for King and Pierce Counties; Caires for Kitsap County. They each signed a standard form agreement, which provided in part:

> Sugar 'n Spice (hereinafter called the Company) hereby agrees that for a period of one year beginning this _____ day of _____ 19___ , (renewable in writing, by the Wholesale Distributor only, ten days before expiration of this agreement), it will sell products that it manufactures and distributes, non–exclusively, to _____ (hereinafter called the Wholesale Distributor.) for the territory described in paragraph 1 hereof, subject to the following terms and conditions. It is understood that the territory restriction on the part of the Company applies only to the brand name SUGAR 'N SPICE and does not affect other brands or products manufactured or Distributed by the Company and/or its affiliates.
>
> Company agrees as follows:
>
> 1. TERRITORY: The area granted by the company to the Wholesale Distributor hereunder is the General Area of:
> _____.
> . . .
> 3. MERCHANDISING SUPPLIES & TRAINING PROGRAM: Co. will furnish Wholesale DISTRIBUTOR with the following; as per purchase order. The company will also provide a Company representative at Wholesale Distributors place of business for a minimum of two (2) days to train the

Wholesale Distributor on product, merchandising, and packaging. The Company Representative will also at this time instruct the Wholesale Distributor on how to establish Dealers locations in his area. The Company Representative will also obtain _____ Dealer locations for the Wholesale Distributor at this time and will turn over to Wholesale Distributor these _____ Dealer locations. The Company obligation for establishing retail locations will now be at an end. The Company does not agree to secure any particular locations. It only agrees to endeavor to secure for Wholesale Distributor as profitable and desirable retail locations as it reasonably can.

Wholesale Distributor agrees as follows:

A. MONTHLY REPORT: To submit a Monthly Progress Report to factually show movement of merchandise, by each of the dealers in his territory and other related data.

B. INDEPENDENT CONTRACTOR: That he is an Independent Contractor and not an employee of the Company and shall not use the Company name for the procurement of Credit and shall in no way conduct his business in such a manner that may prove detrimental to the good name of the Company.

C. INVENTORY: To maintain an ample supply of Company products for Dealers in your area and to diligently promote the sale of the Company products.

D. CONTRACT RENEWAL: This Wholesale Distributorship will be automatically renewed each year, providing the Wholesale Distributor's annual purchases exceed amount of original purchase order or _____.

E. OPENING INVENTORY: See attached purchase order.

F. TOTAL AMOUNT OF ORDER: $_____ Make Checks Payable to Sugar 'N Spice.

G. TERMS: (A) Payment in full accompanies orders. This agreement shall be valid and binding upon both Company and Wholesale Distributor for a period of one year, after which it may be renewed or extended at the Distributor's request and the Company's consent on a year-to-year basis, providing the Wholesale Distributor has complied with Paragraph D.

Lobdell and Caires soon received their shipments of can-

dies, sugar, and packaging materials, accompanied by a "question and answer manual" and followed by monthly newsletters. The newsletters introduced new products, labels and display materials, touted the financial successes of individual distributors, exhorted distributors to aggressively promote and purchase additional company products, and described changes in ordering and reporting procedures. Both the newsletters and the manual warn distributors who fail to submit monthly reports that they are in violation of their contracts and may have their sales territories reassigned.[1]

The display materials and labels included in the distributorship package carried the distinctive Sugar 'N Spice logotype. The company had registered the logotype with the California Secretary of State and had applied for a federal patent on it. Distributors were not contractually obligated, however, to use the name "Sugar 'N Spice" but could sell the products under other brand names.

At trial Christopher testified that included in the sum distributors paid for their distributorships were charges for the cost of securing retail locations for the racks and for the cost of advertising. In his deposition Christopher stated that the initial sum distributors paid included training costs.

On appeal Lobdell and Caires challenge the trial court's conclusions that they had failed to prove a violation of the CPA and had failed to prove that "the sale in question was a sale of a franchise to them." Under the FIPA,

> a business which distributes products of another has a franchise if two requirements are met: (1) the agreement between the parties includes a license to the franchisee to

---

[1]For example, the March 1977 newsletter stated: "As of the 10th of each month, starting April 10, 1977, if your monthly report is not in our office, we will take you from the active file, your area will be opened, and we will no longer send price lists, new items, or literature."

From the "question and answer manual": "Q. Must every Distributor send in a monthly report? A. If you want to keep your Distributorship and the contract with the Company valid, YES. This is part of the contract agreement every Distributor signed . . ."

use a trademark or "related characteristic" of the franchisor, and (2) the franchisee pays a "franchise fee." *American Oil Co. v. Columbia Oil Co.*, 88 Wn.2d 835, 840, 567 P.2d 637 (1977). The statute also requires a "community interest in the business of offering, selling, distributing goods or services at wholesale or retail, leasing, or otherwise". RCW 19.100.010(4).

## STANDARDS OF REVIEW

Whether a statute applies to a factual situation is a question of law and fully reviewable upon appeal. *Keyes v. Bollinger*, 31 Wn. App. 286, 640 P.2d 1077 (1982). We are bound by findings of fact which are supported by substantial evidence. *Beeson v. ARCO*, 88 Wn.2d 499, 563 P.2d 822 (1977). No finding as to a material fact constitutes a negative finding, *McCutcheon v. Brownfield*, 2 Wn. App. 348, 467 P.2d 868 (1970), unless there is undisputed evidence which an appellate court can hold compels a contrary finding. *LaHue v. Keystone Inv. Co.*, 6 Wn. App. 765, 496 P.2d 343 (1972). An appellate court may also independently review evidence consisting of written documents. *Wilson v. Howard*, 5 Wn. App. 169, 486 P.2d 1172 (1971). With these standards in mind, we turn to the question of whether the Sugar 'N Spice "distributorships" were franchises under the FIPA.

## FRANCHISING AND THE FIPA

Distinguishing franchises in a precise manner from other marketing systems is a difficult task. Franchisees occupy an undefined middle ground, possessing some of the autonomy of retail or wholesale dealers, yet some of the dependence of employees or agents. Selling brand name merchandise does not make an independent dealer a franchisee. Chisum, *State Regulation of Franchising: The Washington Experience*, 48 Wash. L. Rev. 291, 294 n.6, 343 (1973). Greater interdependence between dealer and supplier is required. The character and extent of that interdependence is the issue on appeal.

Franchises generally fall into two classes: product and

service franchises and trademark licensing franchises. Chisum, at 294. In product and service franchises, the franchisor grants the right to distribute its products under its trade name and trademark. In trademark licensing franchises, the franchisor grants the right to produce and sell goods or services under its trade name and trademark. Chisum, at 294–95. Sugar 'N Spice distributorships may be a hybrid of these two types by virtue of the distributors' direct sale of company products and their production and sale of "sugar art."

■ Franchising offers advantages to both franchisors and franchisees. The franchisor obtains a distribution system while the franchisee gains access to "an established brand name, tested marketing techniques, advertising and training aids." Chisum, at 296. Franchising has disadvantages for franchisees, however, who suffer a lack of material information before purchasing their franchise and of bargaining power after purchasing. Chisum, at 297. *See generally* C. Rosenfield, *Franchising,* ch. 1 (1970) (history of franchising and its regulation). The State Legislature enacted the FIPA in 1972 in order to correct this maldistribution of information and power. Chisum. The Act deals with franchise sales abuses by requiring registration of offers and full disclosure of facts material to the transaction. RCW 19.100.020, .040; Chisum, at 358–59.

The defendants do not challenge the trial court's finding that neither they nor their offers were registered. RCW 19.100.020 proscribes any "franchisor" from offering or selling unregistered franchises. "Franchisor" is defined as "a person who grants a franchise to another person." RCW 19.100.010(7). RCW 19.100.140(1) proscribes any "person" from offering or selling an unregistered franchise. A "person" is further defined to encompass natural persons, "as well as the individual officers, directors, and other persons in act of control of the activities of each such entity." RCW 19.100.010(12). The trial court found that Wilcox was an agent and Bellman a subagent in the distributorship sales to Lobdell and Caires. If the distributorships were fran-

chises, Wilcox and Bellman, as "persons" selling unregistered franchises, violated RCW 19.100.140(1). The trial court also found that Christopher was president and sole owner of Sugar 'N Spice. If the Sugar 'N Spice distributorships were franchises, being both a "franchisor" under RCW 19.100.010(7) and a "person" under RCW 19.100-.010(12), Christopher violated RCW 19.100.020 and .140(1).

LICENSE TO USE A TRADEMARK OR LOGOTYPE

The trial court failed to precisely rule whether the distributorship agreements included the grant of a "license to use a trade name, service mark, trade mark, logotype or related characteristic . . .", RCW 19.100.010(4), but made the following findings of fact:

That the plaintiffs and the intervenor Third Party plaintiff were not required to use the SUGAR 'N SPICE name or any of its merchandise and Plaintiffs' exhibit number 7, rack containing candies packaged by the Plaintiffs LOBDELL and CAIRES has items without such logo or label of SUGAR 'N SPICE.

Finding of fact 14.

That the use of the name and logo of SUGAR 'N SPICE had no meaning to the general public and was an insignificant part of the packaging of these candies.

Finding of fact 15.

Giving meaning to this first element of the definition of "franchise" is a problem which has perplexed other courts faced with interpreting similar statutes. The New Jersey court in *Finlay & Assocs., Inc. v. Borg–Warner Corp.*, 146 N.J. Super. 210, 369 A.2d 541 (1976), considering nearly identical language, cautioned that too expansive an interpretation could have unintended results.

In a broad sense, any arrangement between a manufacturer and seller or distributor or retailer to sell a brand–name product could be considered a franchise. However, merely because there is a sale or distribution agreement does not make it a franchise within the purview of the act.

*Finlay,* at 218. Focusing on the statutory language, the

*Finlay* court held that "license" in the context of the statute means "to use as if . . . one's own," and implies a "proprietary interest" in the trade name, service or trademark, or logotype. *Finlay,* at 219.

Other jurisdictions have identified features distinguishing franchises from independent wholesale or retail businesses. In *Chase Manhattan Bank, N.A. v. Clusiau Sales & Rental, Inc.,* 308 N.W.2d 490 (Minn. 1981), the court found that a contract whereby the dealer agreed to order products and marketing materials from the company and to follow company business procedures and policies, and the company agreed to grant the dealer the right to operate the only dealership in that county and to provide advertising and a policy manual, constituted a contract "by which a franchisee is granted the right to engage in the business of offering or distributing goods or services using the franchisor's trade name, trademark, service mark, [or] logotype . . ." Minn. Stat. § 80C.01(4)(a) (1980). The Illinois court in *Brenkman v. Belmont Mktg., Inc.,* 87 Ill. App. 3d 1060, 410 N.E.2d 500 (1980) found a similar statutory element met in the franchisor's grant of the right to sell its memberships, together with the franchisor's registration of its trade name with the secretary of state.

■ We find the above authority persuasive, and hold that the Sugar 'N Spice distributorship agreement, which we independently review, *Wilson v. Howard, supra,* granted to Lobdell and Caires a license to use the Sugar 'N Spice trade name and logotype. This grant is implicit in the grant of territory for the sale of the company's self–described "instantly recognized" products. Lobdell and Caires thereby acquired a proprietary interest, *Finlay,* in the Sugar 'N Spice name and logotype, which could be lost if they failed to submit monthly reports. The company's registration of and patent application for the trade name Sugar 'N Spice is indicative of its perceived value, and therefore corroborative of the company's grant of a license for its use. *Brenkman.*

The trial court's requirement that consumers be familiar

with the trade name or logotype and that distributors be obligated to market only under that name imposes too strict a construction on the FIPA. The language of the Act provides no support for insisting upon consumer recognition and distributor fidelity. Nor is such an interpretation supported by the Act's beneficial purposes. Its full disclosure and fair practices provisions would be no less important to a franchisee engaged in selling an obscure brand or to one who is legally free to market its products under other brand names. We conclude that Lobdell and Caires were granted a license under the FIPA.

### FRANCHISE FEE

The second statutory requirement of a franchise is the payment of a franchise fee. The statutory definition is broad and includes a multitude of arrangements:

> (11) "Franchise fee" means any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement, including, but not limited to, the payment either in lump sum or by installments of an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales whether or not referred to as royalty fees, any payment for the *mandatory purchase of goods or services or any payment for goods or services available only from the franchisor, or any training fees* or training school fees or charges; however, the following shall not be considered payment of a franchise fee: (a) the purchase or agreement to purchase goods at a bona fide wholesale price;
> . . .

(Italics ours.) RCW 19.100.010(11).

The trial court entered no finding or conclusion concerning the payment of a franchise fee. Uncontroverted evidence was presented, however, from which we can infer that Lobdell and Caires paid a fee for the right to enter into a business. *LaHue v. Keystone Inv. Co., supra.* Christopher testified that included in the $7,670.68 each plaintiff paid were charges for the cost of finding retail locations for their racks, and for the cost of advertising Sugar 'N Spice

products. They therefore paid a "mandatory" charge or charge for "services available only from the franchisor" as described by the statute. *Accord,* Chisum, at 342 n.258 (charges for advertising franchise system is a franchise fee). Christopher also stated in his deposition that the price of a distributorship included charges to offset the costs of training, a franchise fee under the statutory definition.

"Franchise fee" is defined broadly to include fees hidden in the franchisor's charges for goods or services. Chisum, at 343. The sum of the company's charges for locations, company advertising, and training was such a hidden franchise fee.

### COMMUNITY INTEREST

The Act also requires a "community interest" in the business of offering, selling, or distributing goods or services, RCW 19.100.010(4), defined as "a continuing financial interest between the franchisor and franchisee in the operation of the franchise business." RCW 19.100.010(2). The trial court entered the following finding concerning community interest:

> That there was no community of interest between the Plaintiffs and intervenor Third Party Plaintiff and Defendants in that Defendants did not exercise that control over the Plaintiffs and intervenor Third Party Plaintiff, did not share in the profits of any sales made by Plaintiffs or intervenor Third Party Plaintiff, the candies were impulse buying items and the packaging contents sold by their appearance and location, not by the name Sugar 'N Spice.

■ The statute, however, requires none of these additional elements. The "continuing financial interest" referred to in the definition implies neither control by the company over the distributor as in a master–servant relationship nor sharing of profits as in a partnership relationship. The status of a franchisee is unique and more akin to that of a limited independent contractor, marked neither by one party's absolute control over the other nor by a sharing of proceeds. *See Matarazzo v. Friendly Ice Cream Corp.,* 70 F.R.D. 556, 559 (E.D.N.Y. 1976). The trial court's

finding, therefore, fails to support its conclusion that no community interest existed between the parties.

Our independent review of the documents presented at trial, *Wilson v. Howard, supra,* reveals the requisite community of interest. The distributorship agreement bound Lobdell and Caires to purchase and the company to sell them Sugar 'N Spice products for 1 year, renewable if their annual purchases exceed $1,000. An agreement to purchase trade name merchandise, while insufficient without more, suffices to prove community interest when coupled with a supply contract for a definite term. This is so because there is a continuing financial interest in the resale of the merchandise. J. Fletcher, Franchise Investment Protection Act 29–30 (June 1971) (unpublished thesis in University of Washington Law School Library). Lobdell's and Caires' other contractual obligations to maintain an ample supply of and diligently promote company products as well as to submit regular reports on sales further convey this sense of shared financial interest.

## CONSUMER PROTECTION ACT

Having determined that defendants violated the FIPA, we need not address whether they also violated the CPA as both statutes allow recovery of treble actual damages and of costs and attorney's fees.

We reverse the judgment dismissing the plaintiffs' claims and awarding attorney's fees and costs to the defendants. We remand to the trial court for entry of judgment in favor of the plaintiffs on the issue of liability, for trial on damages, and for a determination of plaintiffs' attorney's fees and costs incurred at trial and in this appeal.

DURHAM, A.C.J., and SCHOLFIELD, J., concur.

Reconsideration denied March 8, 1983.

Review denied by Supreme Court May 24, 1983.