914 F.2d 188
 Jerry A. BLANTON, an individual; J & S Petroleum Services,
Inc., a Washington corporation, Plaintiffs-Appellants,
v.
TEXACO REFINING AND MARKETING, INC., a Delaware corporation,
successor-in-interest to Texaco, Inc., a Delaware
corporation, Defendant-Appellee.
 No. 89-35380.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 10, 1990.
Decided Sept. 14, 1990.
 
 Robert H. Alsdorf, Armstrong, Alsdorf, Bradbury & Maier, P.C., Seattle, Wash., for plaintiffs-appellants.
 James L. Robart, Randall P. Beighle, Lane, Powell, Moss & Miller, Seattle, Wash., for defendant-appellee.
 Appeal from the United States District Court for the Western District of Washington.
 Before WRIGHT, POOLE and BRUNETTI, Circuit Judges.
 BRUNETTI, Circuit Judge:
 
 
 1
 Jerry Blanton ("Blanton") sued Texaco Refining & Marketing, Inc. ("Texaco") seeking a declaration that the relationship created by the parties' "contract operation" contract constituted a franchise relationship within the meaning of Washington's Franchise Investment Protection Act, Wash.Rev.Code Secs. 19.100, et seq. ("FIPA").
 
 Facts and Procedural History
 
 2
 Blanton has operated various motor fuels stations for several oil companies as a lessee-dealer or an independent dealer since 1967. Effective April 1, 1983, Blanton and Texaco entered into a "contract operation" contract making Blanton the operator of a Texaco self-service motor fuels station and convenience store located in Seattle, Washington.[1]
 
 
 3
 Under the contract, Texaco's standard generic "contract operation" agreement used in Washington state, Texaco would own the station, which included gasoline dispensing pumps and a small convenience store, and would pay all costs and expenses related to business telephone, utilities, gasoline licenses and permits, painting, trash and snow removal, and the maintenance of air conditioners, refrigeration units, door locks, safes, and other equipment and fixtures owned by Texaco. Blanton would open and close the facility, provide proper illumination during operating hours, turn motor fuel dispensers off and on, collect customer payments for self-dispensed motor fuel, remit these payments to Texaco with various accounting records and reports regarding these payments, pay costs and expenses not covered by Texaco as provided above, and would assume other minor obligations connected with the operation of the facility, including staffing, payroll, and insurance coverage. For these various duties Texaco would pay Blanton an hourly fee, negotiated at then-prevailing market rates and subject to semi-annual renegotiation.
 
 
 4
 Texaco would own, deliver, and price all motor fuel, and would receive all motor fuel sales revenue. Blanton would not receive or participate in any of the motor fuel sales revenue, but would be responsible for certain revenue losses due to employee misconduct, mishandling of funds, theft, robbery, burglary, fraudulent credit card transactions, driveoffs, and the loss of Texaco motor fuel inventory. Texaco would be responsible for losses due to the failure of its equipment, such as safety boxes, consoles, dispensing equipment, tanks, or pump meters.
 
 
 5
 Blanton also would operate the convenience store, purchasing, stocking, handling, advertising, pricing, and reselling its inventory, and would receive all store sales revenues. For this privilege, Blanton would pay Texaco a monthly rent based upon a percentage of all gross non-motor fuel sales revenue.[2] Lastly, either party could terminate the contract on ninety days' written notice.
 
 
 6
 When the station and convenience store officially opened in November of 1983, the parties negotiated Blanton's hourly fee as $4.75/hour. In April of 1984 the parties renegotiated this fee, increasing it to $5.75/hour. In July of 1984 the parties again renegotiated the fee, reducing it to its original amount of $4.75/hour. The fee remained at $4.75/hour until late 1987, when Blanton and Texaco attempted to renegotiate. When the parties could not agree on the fee, Texaco exercised its option to terminate the contract, effective April 30, 1988.
 
 
 7
 Blanton's complaint, filed in Washington state court, sought (1) a declaratory judgment that the relationship created by the parties' contract constituted a franchise relationship as defined by FIPA and (2) damages for Texaco's alleged appropriation of goodwill when it did not renew the contract. Texaco removed the case to federal court. On motion for summary judgment, the district court held that the relationship created by the parties' contract did not constitute a franchise relationship within the meaning of FIPA, because Blanton failed to establish that he and Texaco shared a "community interest." Blanton appeals this ruling and seeks attorney's fees. We affirm.
 
 Discussion
 
 8
 We review a grant of summary judgment de novo. Kruso v. International Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Tzung v. State Farm Fire & Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989). We review the district court's interpretation of state law under the same independent de novo standard as questions of federal law. In re McLinn, 739 F.2d 1395, 1397 (9th Cir.1984) (en banc).
 
 
 9
 Blanton contends that the relationship created by the parties' contract constituted a franchise relationship under FIPA and that Blanton and Texaco had the requisite "community interest."[3]
 
 
 10
 The term "franchise" is specifically defined by FIPA:
 
 
 11
 "Franchise" means an oral or written contract or agreement ... in which a person grants to another person, a license to use a trade name, service mark, trade mark, logotype or related characteristic in which there is a community interest in the business of offering, selling, distributing goods or services at wholesale or retail, leasing, or otherwise and in which the franchisee is required to pay, directly or indirectly, a franchise fee.
 
 
 12
 Wash.Rev.Code Sec. 19.100.010(4).
 
 
 13
 Thus, under Washington law the existence of a franchise may be established by showing three elements: (1) the grant of a "trademark license"; (2) a "community interest" in the business of selling goods or services; and (3) payment, directly or indirectly, of a "franchise fee." See Lobdell v. Sugar 'N Spice, Inc., 33 Wash.App. 881, 886-87, 658 P.2d 1267, 1271 (1983).
 
 
 14
 In Lobdell, the leading Washington case on "community interest," the court held that FIPA
 
 
 15
 also requires a "community interest" in the business ... defined as "a continuing financial interest" between the franchisor and franchisee in the operation of the franchise business.... The "continuing financial interest" referred to in the definition implies neither control by the company over the distributor as in a master-servant relationship nor sharing of profits as in a partnership relationship. The status of a franchisee is unique and more akin to that of a limited independent contractor, marked neither by one party's absolute control over the other nor by a sharing of proceeds.
 
 
 16
 Id. at 892, 658 P.2d at 1273-74.
 
 
 17
 The court went on to hold that a purchase agreement coupled with a supply contract for a definite term indicates a continuing financial interest in the resale of the merchandise. Id. at 893, 658 P.2d at 1274.
 
 
 18
 Blanton contends that his hourly fee was based upon Texaco's motor fuel sales revenues and his own convenience store revenues, and therefore the parties have a "community interest." However, the record evidence does not support Blanton's contention. Although the parties' original contract included a schedule that computed the hourly fee as inversely related to the volume of convenience store sales, the record shows that this schedule was never used and was deleted from rate forms as of April 1984. Moreover, Blanton himself admitted that the variable rate portion of the form was never applied and that his hourly fee was never calculated in this manner.
 
 
 19
 The record shows that his hourly fee was determined by market forces through negotiation between Texaco and Blanton. While the record shows that Blanton's monthly convenience store revenues and Texaco's monthly motor fuel sales revenues varied considerably, his hourly fee was $4.75/hour for the entire duration of the contract, except for a brief start-up period when the fee was $5.75/hour. His hourly fee was never calculated in relation to either parties' revenues.[4] Therefore, we find that Blanton failed to present sufficient evidence of a "community interest" of the parties. See Lobdell at 892, 658 P.2d at 1273-74.[5]
 
 Conclusion
 
 20
 We affirm the district court's order granting summary judgment to Texaco, as the court properly ruled that the relationship created by the parties' "contract operation" contract did not constitute a franchise relationship within the meaning of FIPA, because Blanton failed to present sufficient evidence to establish that he and Texaco shared a "community interest" as required by FIPA. Because we rule in favor of Texaco on the merits, we deny Blanton's request for attorney's fees.
 
 
 21
 AFFIRMED.
 
 
 
 [1]
 Blanton also entered into similar contracts with Texaco covering several other Seattle area Texaco stations. However, only the parties' contract regarding the 15th Avenue station and the parties' concomitant relationship are at issue in this litigation
 
 
 [2]
 Despite the wording of the contract, however, Blanton actually received the convenience store rent-free
 
 
 [3]
 In block capitals at the top of the first page of the contract was the legend:
 THIS CONTRACT DOES NOT CREATE A FRANCHISE RELATIONSHIP UNDER STATE OR FEDERAL LAW (See Paragraph C)
 Paragraph C on page two of the contract provided:
 No Franchise--Contractor acknowledges that this Contract does not create, extend, or renew a franchise under any local, state, or federal law including the Federal Petroleum Marketing Practices Act (PMPA). Contractor further acknowledges that this Contract with Texaco is a separate and distinct Contract and is not associated with any other agreements, contracts, or franchise relationships which may now or hereafter exist between Texaco and Contractor. Contractor further acknowledges that Texaco is the retailer of the facilities to be operated hereunder and that this Contract does not give any rights to the Contractor as a Texaco retailer.
 However, while these provisions provide some indication of the parties' understanding of the contract at the time of its formation, they do not conclusively settle the issue of whether or not the contract created a franchise relationship: "Any ... stipulation or provision purporting to bind any person acquiring a franchise at the time of entering into a franchise or other agreement to waive compliance with [FIPA] is void." Wash.Rev.Code Sec. 19.100.220. Therefore, we must analyze FIPA and the merits of Blanton's claims.
 
 
 [4]
 Blanton also contends that his liability for driveoffs and other revenue losses created a "community interest" between the parties. Blanton contracted to collect payments for customer-dispensed motor fuel. If there was a shortfall in the collection, he was liable. Blanton's liability for such shortfalls was simply part of the operating contract and one of the conditions he assumed in the money collection process. It had nothing to do with the dispensing of motor fuel or related sales revenues or profits and did not create a "community interest."
 
 
 [5]
 Because we find that Blanton did not present sufficient evidence of a "community interest," we need not address whether Blanton presented sufficient evidence of his alleged payment of a direct or indirect "franchise fee." See Lobdell at 886-87, 658 P.2d at 1271 (both requirements must be satisfied to constitute franchise relationship)