62 P.3d 544 (2003)
115 Wash.App. 343
CORPORATE RESOURCES, INC., a Washington corporation, Appellant,
v.
EAGLE HARDWARE & GARDEN, INC., a dissolved Washington corporation; Lowe's Home Centers, Inc., a foreign corporation; Lowe's HIW, Inc., a foreign corporation; Lowe's HIW, Inc., a Washington corporation; and Lowe's Companies, Inc., a foreign corporation, Respondents.
No. 49869-0-I.
Court of Appeals of Washington, Division 1.
February 3, 2003.
*545 David Mark Byers, Arthur J. Lachman, John Tony John, Douglas, Clayton, Berry, Graham & Dunn, Seattle, WA, for Appellant.
Patricia Lally, Thomas Boeder, Perkins Coie, Seattle, WA, for Respondent.
APPELWICK, J.
Corporate Resources, Inc. (CRI) contests the trial court's denial of its motion for partial summary judgment on the issue of whether its relationship with Eagle Hardware & Garden, Inc./Lowe's (Eagle), constituted a franchise under the Washington Franchise Investment Protection Act,[1] and the trial court's grant of summary judgment to Eagle. CRI provided installation services of home improvement products and appliances to Eagle's customers. Pursuant to the terms of the parties' written agreement, Eagle provided 30 days' written notice terminating the agreement.
The issue on appeal is whether CRI and Eagle had a franchisor-franchisee relationship. Because CRI has not demonstrated that it paid Eagle a franchise fee, it is not a franchise as defined in RCW 19.100.010(4)(iii). We affirm the trial court.

FACTS
Lowe's predecessor company, Eagle Hardware & Garden, Inc./Lowe's, (Eagle), sold building materials, major appliances, and home improvement items to home and commercial customers. To remain competitive, Eagle decided to offer its customers installation services, and elected to outsource them. In April 1993, Eagle and Corporate Resources, Inc. (CRI) negotiated a written agreement granting CRI the right to arrange and execute home improvement installations for Eagle customers. The parties' agreement did not prohibit CRI from assuming other installation jobs.
Eagle referred its customers interested in installation of Eagle products to CRI; CRI did not refer customers to Eagle. Eagle retail stores were the central location for customers who generally paid Eagle for installation services at the time they purchased their products. On occasions where a CRI contractor closed a sale in the customer's home, the contractor was authorized to accept payment, but all payment was made directly to Eagle. For example, a contractor could not accept cash, but could accept a check made out to "Eagle Hardware & Garden." If a contractor visited a customer's home but the sale was not closed at the home, the customer thereafter visited an Eagle store to pay for products and installation.
Based on a schedule of charges which CRI and Eagle negotiated at the inception of their contract and periodically updated, Eagle paid CRI for labor and installation costs. At times, to remain competitive, Eagle reduced the prices it charged its customers. On these occasions, Eagle paid CRI the full amount in the schedule, and Eagle either decreased its markup or absorbed a loss on the job.
After Eagle's completion of a merger agreement with Lowe's, Eagle/Lowe's informed CRI that pursuant to the terms of their contract, it was terminating the CRI installation program in several states. On December 2, 1999, Eagle/Lowe's notified CRI in writing that effective Jan 2, 2000, it was terminating installation services with respect to all remaining Eagle stores.[2]
*546 Following Eagle/Lowe's termination of CRI's services, CRI brought an action in Snohomish County Superior Court, moving for partial summary judgment on the issue of whether the relationship between Eagle and CRI was a franchise agreement under chapter 19.100 RCW. Eagle filed a cross-motion for summary judgment dismissing CRI's action.
The trial court based summary judgment in favor of Eagle/Lowe's on a finding that the relationship between CRI and Eagle was not a franchise as governed by chapter 19.100 RCW. We affirm.

ANALYSIS
I. Standard of Review
When reviewing summary judgment, the appellate court engages in the same inquiry as the trial court and reviews the evidence de novo. Fischer-McReynolds v. Quasim, 101 Wash.App. 801, 807, 6 P.3d 30 (2000). The court will grant a summary judgment only if, after viewing the record along with all reasonable inferences in the light most favorable to the nonmoving party, the court can say that as a matter of law (1) there is no genuine issue of material fact, (2) all reasonable persons could reach only one conclusion, and (3) the moving party is entitled to judgment. Fischer-McReynolds, 101 Wash.App. at 807, 6 P.3d 30; CR 56(c). "`A material fact is one upon which the outcome of the litigation depends.'" Fischer-McReynolds, 101 Wash. App. at 807-08, 6 P.3d 30 (quoting Geppert v. State, 31 Wash.App. 33, 39, 639 P.2d 791 (1982)). "The moving party bears the initial burden of showing the absence of an issue of material fact." Fischer-McReynolds, 101 Wash.App. at 807, 6 P.3d 30.
II. The Washington Franchise Investment Protection Act
The Franchise Investment Protection Act (FIPA) was enacted to curb franchisor sales abuses and unfair competitive practices. East Wind Exp., Inc. v. Airborne Freight Corp., 95 Wash.App. 98, 102, 974 P.2d 369 (1999); chapter 19.100 RCW. The FIPA defines franchising, regulates the sales of franchises through registration and disclosure requirements, and provides a "franchisee bill of rights." East Wind, 95 Wash.App. at 102, 974 P.2d 369. Here, Eagle was not registered to sell franchises. CRI concedes that the parties' written agreement does not admit a franchisor-franchisee relationship; nor did the parties discuss their relationship as a franchise. However, neither of these observations is dispositive as to whether the parties had established a franchisor-franchisee relationship. Notwithstanding a lack of registration by a franchisor, or a written agreement's silence as to whether the parties have established a franchisor-franchisee relationship, such a relationship may nevertheless exist. A party may be defined as a franchisee, and thus gain the protection of the FIPA, if its relationship with the alleged franchisor meets the three-prong FIPA test. A franchise is:
a) An agreement, express or implied, oral or written, by which:
i) A person is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan prescribed or suggested in substantial part by the grantor or its affiliate;
ii) The operation of the business is substantially associated with a trademark, service mark, trade name, advertising, or other commercial symbol designating, owned by, or licensed by the grantor or its affiliate; and
iii) The person pays, agrees to pay, or is required to pay, directly or indirectly, a franchise fee.
RCW 19.100.010(4)(a)(i)-(iii).
III. Franchise Fee Analysis
CRI argues that it is a "franchisee" within the meaning of FIPA in part because CRI paid Eagle a franchise fee. RCW 19.100.010(4)(iii) states that "the [franchisee] pays, or agrees to pay, or is required to pay, directly or indirectly, a franchise fee." Thus, CRI must show that it paid, or agreed to pay, or that Eagle required CRI to pay, directly or indirectly, a franchise fee.
FIPA defines "franchise fee," in relevant part, as *547 any fee that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement, including, but not limited to, the payment either in lump sum or by installments of an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales whether or not referred to as royalty fees, any payment for the mandatory purchase of goods or services....
RCW 19.100.010(12).[3] CRI acknowledges that it did not pay a direct franchise fee to Eagle. Rather, it argues that Eagle's profit margin on its installation contracts constituted an indirect fee.
There are few Washington cases discussing indirect franchise fees under the FIPA. We have held that payments for the rental of property not at fair market value will constitute a franchise fee. Corp v. Atlantic-Richfield Co., 45 Wash.App. 563, 568, 726 P.2d 66 (1986). We have also held that charges for the cost of finding retail locations, and company advertising and training, may constitute a hidden franchise fee. Lobdell v. Sugar `N Spice, Inc., 33 Wash.App. 881, 892, 658 P.2d 1267 (1983). The Ninth Circuit Court of Appeals held that under the FIPA, the plaintiffs had presented substantial evidence that they had paid a franchise fee to Mobil Oil Corporation in the form of mandatory purchases of motor oil and other products. Blanton v. Mobil Oil Corp., 721 F.2d 1207, 1220 (9th Cir.1983). Washington courts have not yet addressed whether an installation service agreement can be construed to contain indirect franchise fees.
Interpreting Indiana's statute, the Seventh Circuit Court of Appeals found that no franchise fee had been paid in a situation like the one presented here. Communications Maintenance, Inc. v. Motorola, Inc., 761 F.2d 1202 (7th Cir.1985). Motorola was a manufacturer and seller of radio communications equipment and related services consisting of installation and maintenance contracts. Motorola, 761 F.2d at 1204. Motorola at times subcontracted service work to independent companies, and in that case, did so with Communications Maintenance, Inc. (CMI). After Motorola terminated its contract with CMI, CMI filed suit alleging that it was a franchisee under Indiana franchise law. One of CMI's claims was that it paid Motorola a franchise fee by performing its subcontract work at a price lower than the price Motorola charged its customers. Motorola, 761 F.2d at 1206. The Motorola court held that this arrangement did not qualify as an indirect franchise fee, because the parties' agreement "makes [it] clear that the price CMI charged Motorola for its subcontracting service was not discounted." Motorola, 761 F.2d at 1206. Rather, the court explained that the "contract/subcontract price differential represents the costs incurred by Motorola in negotiating and enforcing its contracts with its radio customers and its subcontract with CMI, and the value of Motorola's goodwill." Motorola, 761 F.2d at 1207.
The Motorola analysis is persuasive in this case. Here, CRI argues that Eagle charged it an indirect franchise fee on each installation performed. There is no evidence to support this claim. The price schedule Eagle produced listing installation costs was based on a "mutual effort" between Eagle and CRI. Any change in the price schedule required the approval of both CRI and Eagle. Moreover, CRI was free to reject a suggested installation fee for a particular job if they were not satisfied with the fee. CRI maintained significant control over what they were paid for their services. Eagle did not dictate CRI's pricing.
For complicated or custom jobs, where CRI visited a prospective customer's home to provide an estimate, those estimates included Eagle's markup. CRI's reimbursement was not discounted by Eagle's markup. There is no evidence in the record suggesting that CRI provided installation work for Eagle at a rate lower than it would have provided had Eagle not added a markup. But to the contrary, the record contains evidence that, on occasion, in order to retain a customer and at *548 the same time accommodate CRI's requested installation fee, Eagle sacrificed its markup.
As in Motorola, Eagle's profit margin here was reflected in the bills presented to its customers. Eagle charged its customers for its products, CRI's installation of those products, and a markup fee. Moreover, Eagle personnel testified that, although it did not run its installation program at a deficit, its markup was designed to sell its products and intended to cover administrative costs. Eagle's profit margin cannot be characterized as a "franchise fee" within the meaning of the FIPA. Such an interpretation of Eagle's profit margin would be tantamount to converting the entire construction industry into a franchise. CRI has presented no other evidence that it made an unrecoverable investment in Eagle. Thus, as a matter of law, CRI is not a franchisee as that term is defined by RCW 19.100.010(4).
CRI also alleges that (1) Eagle granted it the right to offer its services under a marketing plan substantially provided by Eagle, (2) that the operation of its business was substantially associated with Eagle's trademark, and (3) that Eagle "created and maintained the installation program's marketing plan." Because CRI has failed to demonstrate that it paid Eagle a franchise fee, it has failed to meet the three-prong FIPA test.

CONCLUSION
We do not engage in further analysis of the other prongs of the FIPA test. The relationship between CRI and Eagle is not a franchise.
We affirm.
GROSSE, J., and ELLINGTON, J., concur.
NOTES
[1] Chapter 10.100 RCW.
[2] Paragraph 16 of the Eagle/CRI agreement provides:

"The term of this contract shall be for one (1) year from the above date and thereafter for additional successive periods of two (2) years each; provided, however, either party hereto shall have the right to terminate this Contract at anytime during the term or extended term hereof by giving to the to her party at least thirty (30) days prior written notice of such termination."
[3] The FIPA specifically identifies some fees that are not considered franchise fees, but its list of fees is not exclusive. The fees identified are immaterial to our inquiry here. RCW 19.100.010(12)(e).