**MIDDLE TENNESSEE ASSOCIATES, INC., d/b/a MTA Distributors, Plaintiff–Appellee,**

v.

**LEEVILLE MOTORS, INC., and Harley Massa, Defendants–Appellants.**

Supreme Court of Tennessee, at Nashville.

Jan. 7, 1991.

Calvin P. Turner, Lebanon, for defendants-appellants.

David Steed, Nashville, for plaintiff-appellee.

## OPINION

DAUGHTREY, Justice.

This case began as a relatively straightforward action for breach of contract, but it has developed into a rather complex franchise controversy. The original complaint was filed by a wholesale distributor of lawn and garden equipment against a retail dealer who owed the distributor some $12,300 for goods supplied by the distributor. The dealer defended on the basis that the stock had been accepted on consignment only. The dealer also counterclaimed against the distributor, alleging that the contract came under the aegis of a 1977 act requiring "repurchase of terminated franchise inventory." T.C.A. §§ 47–25–1301 et seq. If so, the statute required the distributor to repurchase the goods in question when the sales agreement was terminated and, therefore, the dealer would not be liable for breach of contract.

The trial court dismissed the counterclaim, on the ground that the franchise statute was not applicable to the parties in this case, and held that the dealer was liable to the distributor for the amount owed on account, as well as interest, costs,

and attorney's fees.[1] On appeal, the Court of Appeals disagreed with the trial court's conclusion, found that there was a franchise arrangement, and held that the dealer did have a statutory right to enforce repurchase of the goods following termination of the agreement. The intermediate court also held, however, that the agreement had not yet been terminated so as to give rise to the distributor's obligation of repurchase. Hence, the Court of Appeals affirmed the trial court's judgment on the contract action, but modified the judgment on the counterclaim to provide that "dismissal is based upon prematurity of action and without prejudice to a future suit when rights have been perfected."

We disagree with the determination by the Court of Appeals that the relationship between the parties in this case constituted a franchise. We therefore reverse that portion of the judgment entered by the Court of Appeals on the counterclaim.

### The Factual Background

The plaintiff in this case, Middle Tennessee Associates, Inc., d/b/a MTA Distributors, is a regional distributor of lawn and garden equipment. As agent for MTA, Billy Harrington sent flyers to retail companies throughout Kentucky and Tennessee, seeking local dealers for MTA's line of BCS tillers and small garden tractors and its line of Honda replacement engines. Harley Massa, owner and president of Leeville Motors, was the recipient of one of MTA's flyers. The nature of Massa's business apparently fluctuated. Located in a small rural community, Leeville Motors variously sold old and new trucks, tractors and other farm equipment, and lawn and garden equipment.

In late 1985, after consulting twice with Harrington, Massa signed an "open account application" with MTA and also executed a document entitled "Honda Engine Dealer Agreement."

The open account application covered goods supplied by MTA to Leeville Motors and provided that "all charges will be due and payable within thirty (30) days from the date of each invoice or sales order." It further required a service charge of 1½% on "account balances which are past due." Despite the 30-day limit, Harrington later testified that Leeville Motors was billed under a special "booking program" provided by both BCS and Honda that allowed delayed payment in three equal 30-day installments. Thus, when the initial order of Honda engines and BCS tillers was shipped in January 1986, it was accompanied by invoices requiring repayment at 30-day intervals over the next several months.

When Leeville Motors fell behind in meeting these payments, an MTA representative contacted Massa sometime in May 1986. Massa blamed the failure to pay on bookkeeping problems at Leeville Motors. In fact, Leeville Motors was experiencing what was later described as a "negative cash flow problem." As a result of this failure to pay, MTA started billing Leeville Motors for finance charges, as called for in the open account agreement. Eventually there was a discussion about the possibility of returning the goods to MTA for credit. On July 1, 1986, MTA indicated by letter that it would accept return of the goods, subject to a standard 15% restocking fee. Massa did not reply until September 23, 1986, at which time he informed MTA in writing that he considered the restocking fee unreasonable and that instead of returning them, he would hold the unsold items in storage.

This lawsuit to collect the balance owed by Leeville Motors followed. On the date of trial, April 21, 1988, the goods were still in the possession of Leeville Motors; the record indicates that some of them had been damaged and others had rusted.

### The Franchise Statute

The statute relied upon by the defendants, Leeville Motors and Harley Massa, in their counterclaim against the plaintiff, Middle Tennessee Associates, Inc., is now

---

1. Liability for attorneys fees was established in the original contract between the two parties and is not disputed on appeal.

codified as T.C.A. §§ 47–25–1301—47–25–1310. By its terms, this statute permits "repurchase of terminated franchise inventory." The pertinent portion of § 47–25–1302(a)[2] provides:

> Whenever any retailer enters into a franchise agreement, evidenced by a written contract, with a wholesaler, manufacturer, or distributor wherein the retailer agrees to maintain an inventory and the contract is terminated, then the wholesaler, manufacturer, or distributor shall repurchase the inventory as provided in this part.

Two of the terms used in this repurchase provision are contained in the preceding definitional section, T.C.A. § 47–25–1301. The language of that section makes it clear that the legislature's purpose in enacting the statute was not to protect franchisees in general, but to protect farm equipment dealers in particular. Hence, subsection (3) of § 47–25–1301 defines "inventory" as "farm implements, machinery, utility and industrial equipment, attachments, and repair parts." At the time of this litigation, subsection (5) defined a "retailer" to mean "any person, firm, or corporation engaged in the business of selling and retailing farm implements, machinery, utility and industrial equipment, attachments, or repair parts, but does not include ... retailers of yard and garden equipment not primarily engaged in the farm equipment business." Conspicuously absent from the original statute, in effect at the time the contract in this case was executed, was a definition of the term "franchise" or "franchise agreement." The statute also failed to define "termination" or to specify whether the right-of-repurchase could be triggered upon unilateral termination by the retailer, the distributor, or both.

### The Issue

In his memorandum opinion, the chancellor recognized that the statute provides that, quoting from his opinion, "farm equipment retailers operating under written franchise agreements can require distributors to repurchase inventory when the franchise agreement is terminated." The trial court held, by implication, that in order to trigger application of the statute, termination would have to come at the hands of the distributor, MTA, and concluded that there was no evidence of termination by MTA. Such a construction of the termination requirement would arguably be consistent with an interpretation of the statute as creating protection for franchisees who, saddled with large inventories under the terms of their franchise agreements, suddenly find themselves "holding the bag" when the agreement is terminated unilaterally by the franchisor. The chancellor held, however, that it is unnecessary in this case to reach the question of who has the right of termination, because "the evidence fails to establish that the Act applies to these parties."

The chancellor did not give an explicit reason for this conclusion. By implication, however, the chancellor held that the burden was on Leeville Motors to prove that it was a "retailer" under the statute, that is, "that the company was engaged in the business of selling and retailing farm implements", rather than being a "retailer[ ] of yard and garden equipment not primarily engaged in the farm equipment business." The chancellor explicitly held that Leeville Motors had failed to carry its burden in this regard but made no finding at all concerning the existence of a "franchise agreement."

The Court of Appeals disagreed with the trial court's ruling on the applicability of the franchise statute to these parties. The intermediate court did hold that the initial burden of proof was on the dealer, Leeville Motors, to show that it was "engaged in the business of selling and retailing farm implements," as required by the definition of "retailer" in § 47–25–1301(5). But the court also held that the final provision in that section created an exclusion, which shifted the burden to the party relying on the exclusion, i.e., the distributor, to show that Leeville Motors was a "retailer of yard

---

**2.** Subsections (b) and (c) then provide that the retailer may either retain the inventory or, if the retailer returns it for repurchase, receive a credit against account.

and garden equipment not primarily engaged in the farm equipment business." *Id.* The Court of Appeals then ruled that the distributor had failed to carry its burden in this respect.

Having held the statute applicable to the parties, however, the Court of Appeals refused to enforce the retailer's right of repurchase against the distributor, finding that the Honda Engine Dealer Agreement executed by the parties required a 30–day written notice of termination and, further, that no such written notice had been given. Thus, the court held, the dealer's counterclaim was "premature" and for this reason, and this reason alone, the counterclaim should be dismissed, although without prejudice.[3]

It thus appears that neither of the two lower courts was content to let the outcome rest on what we believe to be the dispositive issue in this case, which is whether the parties entered into an enforceable "franchise agreement" in the first place.

Before discussing this issue, however, we pause to emphasize what has already been decided conclusively below and is not subject to review here: first, that there was a valid contract in this case, and second, that it did not contemplate purchase by the retailer on consignment. These two questions are the subject of concurrent findings of fact in the trial court and the intermediate appellate court, and review of these points by this court is therefore fore-

closed. *Howard v. Haven,* 198 Tenn. 572, 577, 281 S.W.2d 480, 482 (1955); *Stiner v. Powell's Valley Hardware Co.,* 168 Tenn. 99, 75 S.W.2d 406 (1934).

We also point out two other questions that need not be decided in this case, although they became the subject of comment and analysis in the lower courts. The first is the issue of whether Leeville Motors was or was not "primarily engaged in the farm equipment business" and therefore, by definition, whether it was a "retailer" within the meaning of the franchise statute. T.C.A. § 47–25–1301(5). If there was no "franchise agreement" in the first place, it becomes unnecessary to establish this point, or to decide the corollary issue of who has the burden of proving that Leeville Motors was or was not a "retailer."[4]

The second non-issue is the question of whether there was "termination" of the franchise agreement sufficient to trigger the protective provisions of the statute, given the fact that it was the dealer who initiated termination and not the distributor.[5] Again, if there was no "franchise agreement," the legal question of who can validly terminate is, simply, irrelevant. Likewise, the factual question posed by the Court of Appeals concerning compliance with the notice requirement is also irrelevant.[6]

### Analysis of the Agreement

As other courts faced with this problem have noted, "[d]istinguishing fran-

---

3. The Court of Appeals counselled settlement rather than relitigation following the prescribed 30–day written notice of termination.

4. For future guidance, we note our disagreement with the allocation of the burden of proof by the Court of Appeals. In order to rely on the statutory right of repurchase, a retail dealer should have the burden of establishing that it falls within the protective purview of the statute. Who better than the dealer can establish whether or not the dealer is primarily engaged in the farm equipment business?

5. In 1987, the franchise statute was amended to include motorcycle dealers within the definition of "retailers." At that time, the legislature also amended the applicability section to provide that, as to motorcycles, the right of repurchase "shall apply only in instances when the fran-

chise contract is terminated by the wholesaler, manufacturer, or distributor."

6. If left standing, the dismissal of the counterclaim by the Court of Appeals, although ostensibly "without prejudice," would have the same effect as dismissal on the merits. T.C.A. § 47–25–1305(9) provides that the wholesaler is not required to repurchase any items that were purchased 24 months or more prior to notice of termination of the contract. Because the goods involved here were purchased during the first five months of 1986, repurchase has become an impossibility under the terms of the statute. This subsection moots the argument by MTA that it is not required to repurchase the goods in this case because they are no longer in their original condition, as required by T.C.A. § 47–25–1305(7).

chises in a precise manner from other marketing systems is a difficult task." *Lobdell v. Sugar 'N Spice, Inc.*, 33 Wash.App. 881, 658 P.2d 1267, 1271 (1983). The task is made even more difficult when the relevant franchise legislation fails to define what constitutes a "franchise" or a "franchise agreement." The Tennessee statute at issue in this case makes no attempt to describe the type of business relationship to which the requirement of repurchasing inventory applies, except to say that it must be evidenced by a written contract. T.C.A. § 47–25–1302. The franchise statutes in other jurisdictions do not suffer from the same flaw as does the Tennessee statute. Case law from those jurisdictions is largely concerned with the interpretation of legislative definitions of the term "franchise." Generally speaking, there appear to be three aspects of a franchise.[7] First, a franchise involves a franchisor who is engaged in the business of selling or distributing goods under a marketing plan or system devised and prescribed by the franchisor. Second, the operation of the franchisee's business pursuant to the marketing plan involves the trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor. (In some instances, this second requisite is stated as a requirement that the parties have a community of interest in the marketing of goods or services.) Third, the franchisee is ordinarily required to pay, directly or indirectly, a franchise fee.

■ We conclude from our research that the crucial factor in determining whether a franchise exists under the Tennessee statute is whether the purported franchisor conveys authority or license to the franchisee to use the trademark, logo, or trade name of the franchisor. This conclusion is consistent with the definition of "franchise" in the recently enacted statute governing "franchise terminations, nonrenewals or modifications," T.C.A. §§ 47–25–1501 et seq., which was passed after the initiation of the proceedings in this case. Although the new statute is not applicable to the contract in this case and therefore can-

not be considered controlling or even persuasive, *see State ex rel. Grandstaff v. Gore*, 182 Tenn. 94, 100–101, 184 S.W.2d 366, 368 (1945), it is nevertheless instructive on the question of what gives rise to a franchise. T.C.A. § 47–25–1502(1) now provides:

> (1) "Franchise" means a written or oral agreement for a definite or indefinite period in which a person grants to another person authority to use a trade name, trademark, service mark or related characteristic within an exclusive territory, or to sell or distribute goods or services, within an exclusive territory, at wholesale, retail, by lease agreement or otherwise.... Provided, however, that a franchise is not created by a lease, license or concession granted by a retailer to sell goods or furnish services on or from premises which are occupied by the retailer-grantor primarily for its own merchandising activities....

Some states have held that the requirement of a conveyance of the right to use the franchisor's trademark, logo, or trade name means that the franchisee has a proprietary interest in the name, mark, or logo and may use it as if it is the franchisee's own. *Finlay and Associates v. Borg–Warner Corp.*, 146 N.J.Super. 210, 369 A.2d 541 (1976). A franchise is further indicated if the franchisee has the exclusive right to use the mark, name, or logo in a certain region as a result of the proprietary interest in it. *Lobdell v. Sugar 'N Spice, Inc.*, supra, 658 P.2d at 1272. Under this rationale, a franchise cannot exist if the purported franchisor prohibits the purported franchisee from using this name, mark, or logo as part of its business name. *Colt Industries v. Fidelco Pump and Compressor Corp.*, 844 F.2d 117 (3rd Cir.1988). However, it is not necessary that the franchisee be permitted to hold itself out as the franchisor. *Martin Investors, Inc. v. Vander Bie*, 269 N.W.2d 868, 874 (Minn.1978).

■ In this case, there are no reasonable grounds for holding that a franchise was created by that portion of the contract between MTA and Leeville Motors which re-

---

7. See cases collected at 62B Am.Jur.2d *Private* *Franchise Contracts* § 10.

lates to BCS products. These goods, which account for most of the inventory supplied by MTA, were not the subject of the Honda Engine Dealer Agreement or any similar agreement. The record makes no mention of a BCS trademark or logo, nor does it indicate that BCS or MTA conveyed the right to use such a mark to Leeville Motors. Further, there is no evidence of a marketing plan of any sort prescribed by BCS, or by MTA on behalf of BCS, let alone a marketing plan for an exclusive territory.

For these reasons, we hold that no franchise relationship arose between the parties as to the BCS inventory. Hence, MTA cannot be required to repurchase these goods under the Tennessee franchise statute.

■ Nor do we find MTA liable on the counterclaim for the Honda inventory, because there was not a sufficient conveyance in the agreement of the right to use Honda's trademark or logo to indicate the existence of a franchise.

The Honda Engine Dealer Agreement purports to give Leeville Motors the right to use the Honda trademark and logo, but it also contains a lengthy list of restrictions. For example, under the agreement, Leeville Motors was required to discontinue use of Honda's licensed trademarks, or change the manner of use, whenever requested to do so by MTA or Honda. The Honda trademarks could be used in the dealer's business name only with the prior approval of Honda; under no circumstances could they be used as part of the dealer's corporate name. Authorization to use Honda's trademarks would automatically terminate if Honda changed MTA's "primary area of responsibility," an eventuality over which Leeville Motors obviously had no control. Moreover, use of the Honda trademarks could be terminated upon oral or written notification that the dealer no longer met the standards and requirements stated in the agreement and established from time to time by Honda, or by MTA for Honda. Finally, these standards and requirements made Leeville Motors's continued use of the trademarks contingent upon a long list of conditions, including the maintenance of a service shop;

warranty service on any Honda product; signs, displays, and promotional materials; an adequate stock of engines and parts; annual attendance at an engine service clinic; and the availability of the Leeville Motors premises for regular inspection.

The only conclusion we can draw from the total weight of these restrictions is that no proprietary interest in any trade name, trademark, or service mark of Honda's was conveyed from MTA or Honda to Leeville Motors as a result of the "dealer agreement" between the parties. Moreover, the fact that the dealer was not given exclusive rights to market Honda products in its area also indicates that no proprietary interest was conveyed. The possibility of a nearby competitor would have been economically significant to Leeville Motors, the dealer in this case.

Accordingly, we reverse the holding of the Court of Appeals that the arrangement between Leeville Motors and MTA amounted to a franchise. "Selling brand name merchandise does not make an independent dealer a franchisee," *Lobdell v. Sugar 'N Spice, Inc., supra,* 658 P.2d at 1271, even when the merchandising is carried out pursuant to a written agreement such as the Honda Engine Dealer Agreement involved in this case.

It follows that the contract dispute between the parties was properly decided by the trial court in the plaintiff's favor and that the defendants' counterclaim was properly dismissed. We therefore reverse that portion of the judgment of the Court of Appeals which purports to modify the judgment of the trial court; we affirm the remainder of the judgment; and we remand the case to the trial court for redetermination of interest, costs, and attorneys' fees, all of which are to be assessed against the defendants.

Affirmed in part; reversed in part; and remanded.

DROWOTA, C.J., and FONES, COOPER and O'BRIEN, JJ., concur.