**POWER & TELEPHONE SUPPLY COMPANY, INC., Plaintiff,**

v.

**HARMONIC, INC., Defendant.**

No. 01–2972 M1/A.

United States District Court,
W.D. Tennessee,
Western Division.

June 3, 2003.

Cannon F. Allen, James R. Hall, Amy Holliman Brown, Armstrong Allen, PLLC, Memphis, TN, for Power & Telephone Supply Company, Inc., plaintiff.

W. Michael Richards, Baker Donelson Bearman & Caldwell, Memphis, TN, for Harmonic, Inc., defendant.

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT**

McCALLA, District Judge.

Before the Court are Plaintiff's Motion for Partial Summary Judgment, filed August 30, 2002, and Plaintiff's Supplemental Motion for Partial Summary Judgment, filed December 31, 2002. Defendant filed a response to the initial motion on October 1, 2002, to which Plaintiff replied on October 31, 2002. Defendant filed a response to the second motion on March 7, 2003, to which Plaintiff replied on March 21, 2003. For the following reasons, the Court GRANTS in part and DENIES in part Plaintiff's motions for summary judgment.

**I. Background**

This case concerns the purchase and sale of certain equipment pursuant to a Distributorship Agreement. Defendant Harmonic, Inc. ("Harmonic") is a company that manufactures and sells fiber optic equipment for the broadband industry. This equipment includes, among other things, laser transmitters and optical amplifiers designed for fiber optic networks. Harmonic began doing business with Residential Communications Network, Inc. ("RCN"), which provides telecommunications services to residential customers, in 1998. RCN is an overbuilder or Competitive Local Exchange Carrier in the telecommunications sector, which means it constructs new fiber optic networks in major cities for the delivery of video, data, and voice services in competition with incumbent cable and telephone companies. During the late 1990's, RCN pursued an aggressive plan to establish its service in a number of different cities across the country. At RCN's request in 1999, Harmonic and RCN began negotiations with Defendant Power & Telephone Supply Company, Inc. ("P & T") to provide a type of warehousing or distribution service for the products RCN purchased from Harmonic. The parties disagree as to the reason for P & T's involvement in RCN's dealings with Harmonic.

P & T asserts that Harmonic could not meet RCN's fluctuating demand needs and RCN was dissatisfied with Harmonic's untimely delivery of its equipment purchases. P & T asserts that it was brought in to act as a middle man to solve Harmonic's timing and delivery problems. On the other hand, Harmonic asserts that RCN was a new and rapidly growing company that did not have its own warehousing and distribution network and did not have the manpower, infrastructure, and logistical support necessary for a major construction program in multiple cities. Either way, the parties required an intermediary and RCN brought in P & T to solve the problem.

After negotiations, P & T ultimately entered into an agreement with each party. In the Distributorship Agreement between P & T and Harmonic, Harmonic appointed P & T as the non-exclusive reseller of

certain Harmonic products to RCN. The agreement refers to Harmonic as the Supplier and refers to P & T as the Distributor. Pursuant to the agreement, RCN is the only authorized customer for the products P & T purchased from Harmonic. In the agreement between P & T and RCN,[1] RCN retained P & T as its sole supplier of Harmonic products. P & T was required to maintain a minimum inventory of Harmonic products, which RCN agreed to purchase from P & T. The effect of these contracts was to allow P & T to purchase equipment from Harmonic, warehouse it, and resell it to RCN as needed.

During the year 2000, the economy became sluggish, particularly in the telecommunications sector. RCN encountered difficulties raising capital. RCN acquired a company called 21st Century Telecom Group, Inc. ("21st Century") in approximately July of 2000. 21st Century purchased fiber optic equipment from C–COR, a competitor of Harmonic, at prices that were apparently lower than the prices at which RCN purchased equipment from P & T. After receiving competing prices from C–COR, RCN informed Harmonic that it would no longer buy equipment from Harmonic because the prices were too high. Harmonic discovered that the price differential between what it charged and the prices that C–COR charged arose from the markup added by P & T for warehousing and distributing the equipment to RCN.

At some point, RCN, P & T, and Harmonic engaged in negotiations in an attempt to provide RCN with competitive prices for the equipment. According to Charles Conner, Vice President of Harmonic, Harmonic tried to lower the prices during these meetings. However, Harmonic could not lower the price enough for P & T to sell to RCN. RCN then requested direct pricing quotes from Harmonic because the carrying charges through P & T were too high. Harmonic provided its prices to RCN. RCN decided to purchase equipment directly from Harmonic.

In September of 2000, Tom Thorpe of Harmonic sent an e-mail to P & T informing them of the pricing for direct sales to RCN. The e-mail informed P & T that the best price Harmonic could offer P & T was the direct price offered to RCN.

RCN informed Harmonic and P & T that RCN would no longer be purchasing equipment from P & T in the future. From September of 2000 through March of 2001, sales to RCN from P & T declined until RCN no longer purchased any equipment from P & T.

The dispute in this case concerns Harmonic equipment that P & T still holds in inventory. P & T's agreements with Harmonic and RCN required P & T to maintain approximately $2 million in inventory at any given time. Additionally, RCN had submitted several purchase orders to P & T during the latter part of the year 2000, including an order for approximately $2 million of equipment in Oregon, which RCN later canceled. After receiving the purchase orders from RCN, P & T had

---

1. In the record before the Court is a fully executed letter agreement entitled Supply Contract between RCN and Power & Telephone setting forth the basic terms of their arrangement. The parties have also provided the Court with a partially executed Supplier Agreement between P & T and RCN more fully detailing the terms of their arrangement. This agreement contains only P & T's signature. Certain deposition testimony indicates that the parties believe the Supplier Agreement is binding under the Uniform Commercial Code because it has not been contested by either P & T or RCN. The Court is not presented with the question of whether the Supplier Agreement is binding on both parties and, in any event, would make no ruling on this issue because RCN is not a party to this litigation.

ordered and received the equipment from Harmonic. RCN apparently delayed in providing shipping instructions to P & T for some time and eventually canceled the purchase orders altogether.

After RCN canceled various purchase orders and stopped purchasing equipment from P & T, P & T wanted Harmonic to buy back the remaining equipment. In accordance with the terms of section nine, paragraph one of the Distributorship Agreement between Harmonic and P & T, which concerns stock rotation and allows P & T to return up to 15% of the previous six months' purchases, Harmonic agreed to take back approximately $500,000 worth of equipment. This amount included some equipment that was not covered by the stock rotation provisions because P & T had purchased it more than six months prior, but which Harmonic agreed to take back anyway. Even after this repurchase, P & T still held more than $2.5 million of Harmonic equipment.

On May 18, 2001, Jim Pentecost, President of P & T, sent a letter to Harmonic requesting that Harmonic either repurchase the remaining warehoused equipment from P & T or assist P & T in selling the equipment to a third party. Tony Ley, Chairman of Harmonic, responded to this request via letter on June 8, 2001. The letter stated that Harmonic would not repurchase the equipment from P & T. However, the letter also stated that Harmonic would be willing to expand the list of customers to which P & T could sell in order to include any customer with which Harmonic was not already engaged.[2] Mr. Ley proposed a system in which P & T would make a request in writing to sell to a particular customer, which Harmonic would approve if Harmonic did not already do business with that customer. Mr. Ley

also stated that Harmonic would "offer reasonable assistance from a technical and sales standpoint" to help P & T sell the equipment.

P & T apparently has never sought to require RCN to purchase the equipment pursuant to the terms of the Supplier Agreement or the Supply Contract between RCN and Power & Telephone.

P & T filed this suit alleging that Harmonic violated Tenn.Code Ann. § 47–25–1301, *et seq.*, when it failed to repurchase the equipment. P & T further alleges that Harmonic breached the Distributorship Agreement by failing to identify third parties to whom P & T could sell the equipment.

## II. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Supreme Court has explained that the standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548, and the nonmoving party is unable to make such a showing, summary judgment is appropriate. *Emmons v. McLaughlin,* 874 F.2d

---

**2.** The Distributorship Agreement is exclusive as to P & T, which ordinarily may only sell

the Harmonic equipment to RCN.

351, 353 (6th Cir.1989). In considering a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir.1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. Analysis

P & T alleges that Harmonic violated the Tennessee Code when it failed to repurchase the equipment after terminating the Distributorship Agreement by offering direct sales to RCN. P & T further alleges that Harmonic breached the Distributorship Agreement by failing to identify third parties to whom P & T could sell the equipment. The Court will address each of these issues in turn.

### A. Tennessee Code

#### 1. Choice of Law

As a preliminary matter, the Court must determine whether to apply the relevant Tennessee Code sections in this case. The choice of law provision in the Distributorship Agreement states the agreement "shall be governed and construes [sic] in accordance with the laws of the State of California." However, the section of the Tennessee Code at issue in this case contains a provision stating, "Any contractual term restricting the procedural or substantive rights of a retailer under this part, including a choice of law or choice of forum clause, is void." Tenn.Code Ann. § 47–25–1312.

 In Tennessee, contractual choice of law provisions are generally valid.

Tenn.Code Ann. § 47–1–105(1) ("[W]hen a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties."). "In a multi-state transaction, the contracting parties' choice-of-law provision is valid absent contravention of public policy of the forum state or a showing that the selected forum does not bear a reasonable relationship to the transaction." *Carefree Vacations, Inc. v. Brunner*, 615 F.Supp. 211, 215 (W.D.Tenn.1985); *see also Goodwin Bros. Leasing, Inc. v. H & B Inc.*, 597 S.W.2d 303, 307 n. 2 (Tenn.1980).

Applying California law does appear to contravene the public policy of Tennessee in this case. The transactions between Harmonic and P & T bear a reasonable relationship to both Tennessee, where P & T is located and where it warehoused over $38 million of Harmonic equipment, and California, where Harmonic's principal place of business is located and from which Harmonic shipped all of the equipment. However, the legislature of the state of Tennessee has determined that the retailer should not bear the burden of holding unsold inventory upon the termination of a contract between the retailer and the supplier. Tenn.Code Ann. § 47–25–1301, *et seq.* The Court can conceive of no clearer statement of a fundamental policy of Tennessee to protect such retailers than the statutory enactment invalidating contractual choice of law provisions and requiring the parties to comply with Tennessee law. Therefore, if P & T is a retailer of inventory entitled to substantive rights under this part of the Tennessee Code the Court must disregard the choice of law provision.[3]

---

**3.** Practically speaking, the choice of law question in this case may be irrelevant as the California Business and Professions Code § 22900, *et seq.*, contains similar provisions regarding the repurchase of equipment upon the termination of a retail agreement. The California Business and Professions Code provides in pertinent part:

## 2. Repurchase Requirement

The Tennessee Code provides that a retailer has a right to require its supplier to repurchase inventory in the following circumstance:

Whenever any retailer enters into an agreement, evidenced by a written or oral contract, with a supplier wherein the retailer agrees to maintain an inventory of parts and to provide service and the contract is terminated, then the supplier shall repurchase the inventory as provided in this part.

Tenn.Code Ann. § 47–25–1303.

The Tennessee Code provides for civil liability for violations of the repurchase requirement as follows:

If any supplier fails or refuses to repurchase and pay the retailer for any inventory covered under the provisions of this part within sixty (60) days after shipment of such inventory, such supplier shall be civilly liable for one hundred percent (100%) of the current net price of the inventory, plus any freight charges paid by the retailer, the retailer's attorney fees, court costs and interest on the current net price computed at the legal interest rate from the sixty-first day after date of shipment.

Tenn.Code Ann. § 47–25–1308.

A retailer may bring an action for civil damages in a court of competent jurisdiction against any supplier found violating any of the provisions of this part, and may recover damages sustained as a consequence of the supplier's violations together with all costs and attorney's fees.

Tenn.Code Ann. § 47–25–1311(a).

The statute defines "retailer" and "inventory" as follows:

"Inventory" means farm implements and machinery, construction, utility and industrial equipment, consumer products, outdoor power equipment, attachments and repair parts;

Tenn.Code Ann. § 47–25–1301(3).

"Retailer" means any person, firm or corporation engaged in the business of selling and retailing farm implements and machinery, construction, utility and industrial equipment, outdoor power equipment, attachments or repair parts and shall not include retailers of petroleum products;

Tenn.Code Ann. § 47–25–1301(4).

■ The Tennessee Supreme Court set forth the burden of proof under the repurchase sections of the Tennessee Code in *Middle Tenn. Assoc. v. Leeville Motors, Inc.*, 803 S.W.2d 206 (1991). The Tennessee Supreme Court stated, "In order to rely on the statutory right of repurchase, a retail dealer should have the burden of establishing that it falls within the protective purview of the statute." *Leeville Motors*, 803 S.W.2d at 210 n. 4. Accordingly, P & T bears the burden of establishing that it is a retailer of inventory and that Harmonic terminated the parties' agreement without good cause within the meaning of the statute. As discussed below, the Court

(a) Whenever a dealer agreement is terminated by cancellation or nonrenewal, the supplier shall repurchase the inventory as provided in this section.

Cal. Bus. & Prof.Code § 22905 (2003).

(a) "Equipment" means machines designed for or adapted and used for agriculture, livestock, grazing, light industrial, and utility, as those terms are customarily used in the industry. It does not include earthmoving and heavy construction equipment, mining equipment, or forestry equipment as those terms are customarily used in the industry, nor does it include all-terrain vehicles as defined in *Section 111 of the Vehicle Code.*

(c) "Supplier" means a person, partnership, corporation, association, or other business engaged in the manufacturing, assembly, or wholesale distribution of equipment.

Cal. Bus. & Prof.Code § 22901 (2003).

finds that P & T has met its burden of establishing that it is a retailer of inventory within the terms of the statute.

The parties do not seem to dispute that Harmonic qualifies as a "supplier" under § 47–25–1301(6). Harmonic urges the Court to find that P & T is a "distributor" under the Distribution Agreement rather than a "retailer" under the statute. The Court sees no meaningful distinction between these terms in view of the terms of section four of the Distributorship Agreement[4], assuming that the parties' agreement concerned "inventory".

■ The parties have also disagreed as to whether Harmonic terminated or substantially changed the competitive circumstances of the parties' agreement under § 47–25–1302 by selling fiber optic equipment directly to RCN. Notwithstanding Harmonic's vigorous disagreement on this point, the Court finds that Harmonic terminated the agreement or substantially changed the competitive circumstances of the parties' agreement. Although the economy became sluggish and RCN precipitated the problem in this case by canceling purchase orders, Harmonic responded to RCN's position by lowering prices and selling equipment directly to RCN. Harmonic's actions circumvented P & T as the distributor of equipment to RCN and left P & T holding millions of dollars of fiber optic equipment that it could not sell because it had purchased the equipment at a price higher than Harmonic began offering.

■ Therefore, the sole question before the Court is whether the laser transmitters and optical amplifiers constitute inventory within the meaning of § 47–25–1301(3). Answering this question requires the Court to determine what the Tennessee legislature had in mind when it drafted the statute. "The primary purpose of statutory construction is to ascertain and give effect, if possible, to the intention or purpose of the legislature as expressed in the statute." *Westinghouse Electric Corp. v. King*, 678 S.W.2d 19, 23 (Tenn.1984). "In seeking to ascertain legislative intent, we must look to the entire statute in order to avoid any forced or subtle construction of the pertinent language." *Lyons v. Rasar*, 872 S.W.2d 895, 897 (Tenn.1994.) "When the language within the four corners of the statute is unambiguous, the legislative intent must be derived from the statute's face." *Bryant v. Genco Stamping & Mfg. Co.*, 33 S.W.3d 761, 765 (Tenn.2000).

P & T claims that the equipment constitutes "utility equipment", "outdoor power equipment", and "industrial equipment". However, the statute does not contain a definition of "utility equipment", "outdoor power equipment", or "industrial equipment". The statute also has not been examined extensively in case law. The single relevant case concerning this statute, *Middle Tenn. Assoc. v. Leeville Motors, Inc.*, 803 S.W.2d 206 (1991), is twelve years old and pre-dates certain amendments to the statute. Therefore, the Court looks to the plain meaning of the words, the usage of the terms in other sections of the Tennessee Code, and Tennessee case law construing the relevant terms in other circumstances.

To begin with, this part of the Tennessee Code appears to contemplate precisely the type of situation before the Court. The statute protects retailers who hold

---

4. Section four requires P & T to, among other things, "[m]aintain a sales organization capable of representing [Harmonic's] products to customers and to use its best efforts to develop the full sales potential of [Harmonic's] products with such customers", "[m]aintain facilities and support operations sufficient to supply customers with [Harmonic's] products", and "[m]aintain minimum stock levels for each of [Harmonic's] products in the quantities agreed from time to time between [P & T] and the customer(s)".

inventories of certain equipment from being left with that inventory when the manufacturer or wholesaler terminates the parties' contract or otherwise changes the competitive circumstances of the parties' agreement. The only question is whether the parties in this case contracted to purchase and sell the type of inventory covered by the statute.

The Court is mindful of Harmonic's submission of comments made by one of the Tennessee legislators at the time the statute was amended, which evidences an intention to benefit retailers of farm equipment. Likewise, the Tennessee Supreme Court noted in *Leeville Motors* that the statute was enacted "to protect farm equipment dealers in particular". *Leeville Motors*, 803 S.W.2d at 209. Despite the legislative history of the statute, the Court finds that P & T has established that the equipment at issue constitutes industrial equipment. P & T points out that the Tennessee Court of Appeals recently issued an opinion discussing "industrial machinery" in the context of broadcast television signals. In *Freedom Broad. v. Tenn., Dep't of Revenue*, 83 S.W.3d 776, 785 (Tenn.Ct.App.2002), the court held that certain broadcasting equipment used by a television station constitutes "industrial machinery" within the definition of Tenn. Code Ann. § 67–6–102(13)(A), which qualifies for a tax exemption under Tenn.Code Ann. § 67–6–206. The Court found that the television stations "use the equipment and machinery to fabricate and process the broadcast signals."

Although *Freedom Broadcasting* concerned the definition of "industrial machinery" in the area of Tennessee tax law, it would be inconsistent for this Court to determine that the fiber optic equipment in this case does not constitute industrial

equipment. It is undisputed that RCN uses Harmonic's laser transmitters and optical amplifiers to transmit cable television signals. The cable television signals transmitted via Harmonic's fiber optic equipment are analogous to the television signals discussed in the *Freedom Broadcasting* decision. Therefore, the Court finds that the fiber optic equipment at issue in this case is industrial equipment that falls within the definition of inventory in Tenn.Code Ann. § 47–25–1301(3).

The Court also notes that it is likely that the fiber optic equipment in question constitutes utility equipment. Several sections of the Tennessee Code contemplate that telecommunications services and cable television are utilities, which indicates that the fiber optic equipment at issue is utility equipment. See Tenn.Code Ann. § 65–4–101(a) (" 'Public utility' includes ... telephone, telegraph, telecommunications services, or any other like system ..."); Tenn.Code Ann. § 54–14–101(a)(2) ("If the person petitioning for a private road needs additional land for the purpose of extending utility lines, including, but not limited to, electric, natural gas, water, sewage, telephone, or cable television ...").

■ P & T has satisfied the requirements of Tenn.Code Ann. § 47–25–1301, *et seq.*, and is entitled to relief under the statute.[5]

### 3. Constitutionality

■ In the event that the Court finds Tenn.Code Ann. § 47–25–1301, *et seq.*, applicable to the present case, Harmonic has challenged the constitutionality of these Tennessee Code sections. Harmonic alleges that these provisions violate the dormant commerce clause of Article I, Section 8 of the United States Constitution. Har-

---

**5.** To the extent P & T seeks relief under Tenn. Code Ann. § 47–25–1308, it appears that Harmonic may only be held civilly liable for in-

ventory that it failed to repurchase "within sixty (60) days after shipment".

monic argues that this law imposes an undue burden on interstate commerce because it favors local interests and the burden on national and international companies is excessive in relation to the local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

With this repurchase statute, the Tennessee legislature has sought to protect retailers holding inventories of certain equipment when the manufacturer or wholesaler terminates the parties' contract or otherwise changes the competitive circumstances of the parties' agreement. This is a legitimate local interest. To protect retailers, the legislature has also required the parties to such retail contracts to submit to Tennessee law. These sections of the Tennessee Code should apply equally to local retailers who conduct business with out-of-state suppliers and to local suppliers who conduct business with out-of-state retailers. Therefore, the burden on interstate commerce in this case does not appear to be discriminatory. Further, the burden on interstate commerce does not appear to be excessive in relation to the local benefits, particularly in view of the fact that similar repurchase statutes are commonly found, and suppliers are similarly burdened, in most other states. The repurchase statute does not impose a discriminatory burden on interstate commerce and does not violate the dormant commerce clause.

■ Harmonic also asserts that the statute is void for vagueness under the Fourteenth Amendment to the Constitution and Article I, Section 8 of the Tennessee Constitution because the statute is not sufficiently precise to put Harmonic on notice that it would be subject to the statute's terms. In response, P & T argues that the language of a statute need not be drafted with mathematical precision to avoid a judicial declaration that it is void

for vagueness. *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

■ In order to determine whether a statute is void for vagueness, the Court must examine whether the statute is "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *County of Shelby v. McWherter,* 936 S.W.2d 923, 929 (Tenn.Ct.App.1996). Furthermore, "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

The Court acknowledges that the language of this statute is open to a certain degree of interpretation because the statute does not internally define the terms industrial equipment, utility equipment, or outdoor power equipment. However, a review of Tennessee case law and other Tennessee statutes indicates that the fiber optic equipment in this case clearly comes within the meaning of utility and industrial equipment. Therefore, the statute is not so vague that persons of common intelligence would be required to guess at its meaning. The fact that the terms are not internally defined within the statute does not render it unconstitutionally void for vagueness.

**B. Breach of Contract**

■ P & T also asserts that Harmonic breached section nine, paragraph two of the Distributorship Agreement, which provides:

[I]n the event that [RCN] ceases doing business with [P & T] or otherwise discontinues the purchase of [Harmonic's]

products from {P & [T], [Harmonic] agrees to cooperate with [P & T] to identify third parties to whom [P & T's] then-existing stock of products can be sold, and to authorize and assist in negotiating the sale of such products to such third parties at prices that are not less than the prices paid by [P & T] to [Harmonic] for such products.

The issue under this provision is whether Harmonic cooperated with P & T to identify other customers to whom P & T could sell the equipment it held. P & T argues that Harmonic never identified any third parties to whom P & T could sell the equipment and Harmonic refused to allow P & T to sell the equipment to any current customers of Harmonic.

In opposition to Plaintiff's motion for summary judgment on the breach of contract question, Harmonic has provided the Court with a letter sent from Tony Ley at Harmonic to Jim Pentecost at P & T offering Harmonic's assistance in the sale of P & T's remaining warehoused equipment. In this e-mail, Harmonic offers to allow P & T to sell the equipment to other third parties, as long as they are not customers of Harmonic.

Mr. Ley testified that Harmonic was willing to cooperate with P & T, within the terms of section nine, paragraph two, of the Distributorship Agreement, to sell P & T's warehoused equipment once P & T had identified a buyer. Mr. Ley testified that Harmonic was not willing to allow P & T to sell the equipment to Harmonic's existing customers because the supply of broadband equipment already exceeded

demand in the industry and they were having difficulty disposing of their own stock. No provision of the Distributorship Agreement requires Harmonic to allow P & T to sell equipment to Harmonic's current customers.[6]

Further, Charles Conner, Vice President of Harmonic, testified in his deposition that P & T only sought to have Harmonic take the equipment back, but did not want to deal with selling it to anyone else. Mr. Conner stated in his deposition, "[T]hey truly did not want it moved. I think they just wanted it to come back. All I ever heard was, 'We want to send it back.' I mean, I heard it constantly." (Conner Dep. at 204.) According to Mr. Conner, Harmonic and P & T never got to a point where Harmonic could have identified a customer to whom P & T could sell the equipment because P & T really wanted Harmonic to repurchase the equipment.

Mr. Ley's testimony corroborates Mr. Conner's statements. According to Mr. Ley, P & T never specifically asked Harmonic to identify possible customers for P & T. Mr. Ley gave the following deposition testimony:

Q. All right. Did you do anything to identify—did you do anything to identify purchasers, potential purchasers of Power & Tel's inventory?

A. No. I wasn't asked to.

(Ley Dep. at 81.)

Q. You agree with me, Mr. Ley, that Harmonic did not do anything to identify

---

**6.** P & T has argued that Harmonic "covered the market" for purchasers of this equipment and the only available third parties were already customers of Harmonic. Thus, in P & T's view, the duty of good faith and fair dealing required Harmonic to allow P & T to sell to current customers. However, Harmonic has, at the very least, created a genuine issue of material fact on this issue by pointing out

that P & T already does business with rural telephone companies and telephone companies in South America that are not Harmonic customers. Based on the evidence in the record, although Harmonic may already do business with the major customers in the United States, it does not appear to have covered the market.

a third party to whom Power & Tel could sell its then-existing stock?

A. I think that's true. But it says in the agreement, "Supplier agrees to cooperate with." We were very open to cooperation.

Q. But not to identify a customer?

A. We weren't asked to.

(Ley Dep. at 92.)

During his deposition, Mr. Ley also stated that he had two discussions with Mr. Pentecost at P & T as to the possible sale of the equipment to rural telephone companies or telephone companies in Brazil to which P & T had access. Mr. Ley stated he thought this was a good idea because Harmonic did not sell to these types of companies. Apparently, Mr. Pentecost's efforts to sell the equipment to these companies were unsuccessful. After P & T's efforts to sell the equipment to these companies failed, P & T requested that Harmonic take the equipment back. Mr. Ley testified in his deposition as follows:

Q. Did you—do you recall Power & Tel asking Harmonic to identify purchasers, potential purchasers of the equipment that Power & Tel had in stock?

A. No.

\* \* \* \* \* \*

Q. You do not recall—

A. No.

Q. —Power & Tel ever asking Harmonic—

A. Oh.

Q. —"Tell us who we can sell this to"?

A. No. I recall discussions with Mr. Pentecost where we discussed that he had access to the rural telephone companies and to somewhere in, I believe, Brazil. Somewhere in South America. And we originally thought that would be a very good idea because clearly Harmonic did not sell to those people.

\* \* \* \* \* \*

Q. Did he have any further request of you?

A. Oh, yes. He would like—he asked if Harmonic would take back the inventory that he held.

(Ley Dep. at 70–72.)

Harmonic has produced a letter stating that Harmonic was willing to cooperate with P & T and allow P & T to sell the equipment to third parties that were not already customers of Harmonic. Based on the letter from Mr. Ley to Mr. Pentecost, a fact finder could conclude that Harmonic agreed to cooperate within the meaning of the Distributorship Agreement. Furthermore, two witnesses for Harmonic have testified that P & T never specifically asked Harmonic to identify customers to whom P & T could sell the warehoused equipment. These witnesses state that P & T's primary request was for Harmonic to repurchase the equipment. If P & T did not request that Harmonic cooperate with P & T to identify third parties to whom the equipment could be sold because P & T really wanted Harmonic to repurchase the equipment a fact finder could conclude that Harmonic did not breach section nine, paragraph two of the Distributorship Agreement. Harmonic has created a genuine issue of material fact as to whether it breached section nine of the contract with P & T. Accordingly, the Court DENIES P & T's motion for summary judgment on the breach of contract claim.

## IV. Conclusion

For the foregoing reasons, the Court GRANTS in part and DENIES in part Plaintiff's motions for summary judgment.